**JEWS FOR JESUS, INC.; and David A. Lipkowitz, Plaintiffs,**

v.

**JEWISH COMMUNITY RELATIONS COUNCIL OF NEW YORK, INC.; Michael Miller; Robert Kaplan; and Philip D. Abramowitz, Defendants.**

No. 88 Civ. 1985 (RO).

United States District Court,
S.D. New York.

July 29, 1991.

Jay Alan Sekulow, James M. Henderson, Sr., Washington, D.C., Amshoff, Voyles &

---

**25.** The court has reviewed the owners' statute of limitations argument and finds it to be without merit.

Johnson, Louisville, Ky. (Theodore H. Amshoff, Jr., of counsel), Eric A. Daly, Nesconset, N.Y., for plaintiffs.

Patterson, Belknap, Webb & Tyler, New York City (Theodore B. Van Itallie, Jr., Barbara A. McCormick, Jamie Larowitz, of counsel), for defendants.

## OPINION AND ORDER

OWEN, District Judge:

Defendants in this case decided that they would not patronize a particular hotel because they did not wish to share facilities with members of Jews for Jesus. Jews for Jesus' resulting lawsuit challenges the defendants' ability to convey that information to the hotel in question. The question posed by this summary judgment motion is whether the defendants' conduct is protected by the First Amendment. I conclude that it is.

Some time in 1987, the Jewish Community Relations Council, an umbrella organization comprised of about 60 Jewish groups, learned that Jews for Jesus was having its yearly Ingathering at the Stevensville Country Club, a kosher resort facility in the Catskills region of New York State.[1]

Jews for Jesus is an "evangelistic missionary society" whose followers, Jews and non-Jews alike, believe that Jesus was the Messiah, a belief that conflicts with traditional Jewish doctrine. JCRC, among other Jewish organizations, feels that Jews for Jesus uses deceptive tactics in promoting its doctrine and, in particular, that Jews for Jesus missionaries fraudulently and misleadingly use Jewish symbols to associate themselves with Judaism and to attract followers.

According to plaintiff's version of the facts, which for purposes of this motion I accept as true, JCRC also learned that Agudath Israel, an Orthodox Jewish group, was scheduled to have its annual meeting at the Stevensville a week after the planned Jews for Jesus event. JCRC contacted Agudath Israel, told it about Jews for Jesus' reservations at the Stevensville, and inquired whether Agudath Israel would still have its meeting at the Stevensville. Agudath Israel said it would not.[2]

Acting at the behest of Agudath Israel, JCRC also called four other Jewish organizations and asked them "if a circumstance would arise that it would be known that Jews for Jesus were using or planning

---

1. Although the Stevensville is a kosher facility that is patronized by Jewish groups and families, the record reflects that approximately 70 percent of the hotel's business derives from non-Jews, including church groups and other Gentile organizations.

2. It should be noted that defendants do not object to the presence at the Stevensville of all non-Jewish groups or individuals. At his deposition, Rabbi Morris Sherer, president of Agudath Israel, which is not named as a defendant in this action, see infra note 5, explained why his organization would object to Jews for Jesus' presence at the Stevensville:

   By having these conventions back-to-back in this type of hotel it would mean that a large percentage of our leaders and members would not be able to attend. They would consider this harmful to the interests of the Jewish community and its survival.

   .   .   .   .   .

Because ... the Jews for Jesus is conceived in our eyes as a missionary group that harms basic religious interests of our people.

.   .   .   .   .

Agudath Israel's acceptance in the community is because people consider us very loyal to tenets of Judaism. And people, the general public would have believed that we are compromising our principals (sic) by our willingness to have an even distant relationship with a group of this nature.

.   .   .   .   .

[I]n our view, the Jews for Jesus group uses deceptive tactics in trying to win over Jewish boys and girls to their group. They seek a certain credibility and anyone who aids that approach of that Jews for Jesus group is doing something harmful to the furtherance of our religion.

on using a kosher catering facility or the like and you had plans to use the same facility, would you, in fact, continue to plan to use the same facility." [3] Those groups also said that they would not use the same hotel facility as Jews for Jesus.

Finally, JCRC and Agudath Israel separately contacted Mehl Caterers, a Glatt kosher catering concern that subleases and books the Stevensville over the Passover holiday. Agudath Israel had hired Mehl to cater the group's upcoming convention at the Stevensville. Like Agudath Israel, Mehl perceived the Jews for Jesus reservations as a problem and the caterer's president contacted the Stevensville to voice his concern.[4]

Having thus conferred with the various Jewish entities, JCRC Executive Director Michael Miller contacted Kenneth Dinnerstein, the Stevensville's President.[5] Mr. Dinnerstein states in an affidavit that JCRC told him that if the hotel hosted the Jews for Jesus event, the Jewish community would boycott the hotel, "there would be a one hundred and eighty degree turnaround in Jewish support for the Stevensville Country Club," and the *Jewish Press* newspaper would be contacted.[6] Dinner-

stein cancelled the Stevensville's contract with Jews for Jesus and returned the group's deposit. Dinnerstein explained that he made the choice he did because "the economics of these threatened sanctions could have resulted in bankruptcy for the Stevensville Country Club."

Jews for Jesus sued JCRC, alleging a conspiracy to violate plaintiff's civil rights under 42 U.S.C. §§ 1985(3) and 1986, as well as under state law.[7] Both parties now move for summary judgment, their contentions focusing on whether defendants' speech was protected by the First Amendment.

■ In order to facilitate the analysis of this issue, it is useful to view the defendants' speech in two parts. First, there are the private conversations in which the various Jewish groups communicated to each other that, in order to protect the integrity of their religion, *see supra* note 2, they did not wish to patronize a hotel that also accommodated Jews for Jesus. Those conversations obviously involve pure speech, which is protected by the First Amendment. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29

---

3. Defendant Michael Miller, JCRC's Executive Director, stated at his deposition that Agudath Israel informed him that it was planning on cancelling its reservation at the Stevensville and it wanted to know whether other Jewish organizations would react similarly. Miller also stated that he did not mention the Stevensville by name when he posed this question. The four organizations that were surveyed were the Union of American Hebrew Congregations, the Union of Orthodox Jewish Organizations of America, the United Synagogue of America and the Young Israel.

4. Agudath Israel's President, Rabbi Sherer, stated in his deposition that he contacted Mehl and told the caterer that Agudath Israel would have to cancel its convention at the Stevensville if Jews for Jesus' Ingathering were held there the prior week. According to Sherer, Mr. Mehl agreed that the Stevensville would have to make a choice and he also indicated that he was not sure that he could cater the Passover week under those circumstances.

5. Rabbi Sherer also contacted Dinnerstein and informed him that the hotel would have to make a choice between Agudath Israel and Jews

for Jesus. However, plaintiffs did not name Agudath Israel as a defendant in its original complaint, which was filed in 1988. In April 1990, plaintiffs were denied leave to amend their complaint to add claims against Agudath Israel, on the ground that the application was untimely since the facts cited in support of the claims were known to plaintiffs at a much earlier time.

6. I note that there is some dispute as to what statements were made in this conversation. Mr. Miller's account of his conversation with Dinnerstein suggests that there was more of an informative tone and purpose to the exchange, and not a threatening one. However, for purposes of this motion, I accept Mr. Dinnerstein's version, which is the version set forth by plaintiffs.

7. Count One of plaintiffs' complaint charges that defendants conspired to interfere with civil rights in violation of 42 U.S.C. § 1985(3). Count Two charges defendants with neglecting to prevent conspiratorial wrongs in violation of 42 U.S.C. §§ 1985(3) and 1986. Counts Three, Four and Five charge defendants with violations of various provisions of New York State law.

L.Ed.2d 1 (1971).[8] *See also Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (Ku Klux Klan's expression of racist ideas protected by First Amendment).

The second part of defendants' speech involves the communication of the defendants' desire not to patronize a hotel also used by Jews for Jesus to a third party, the Stevensville Hotel. At the outset, whether one considers that speech or conduct, it definitely is not an unlawful economic boycott under *Federal Trade Commission v. Superior Court Trial Lawyers' Association,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990), as plaintiff argues.[9] To the contrary, I conclude that the speech is protected under the First Amendment.

The only difference between the first speech (the speech amongst the Jewish organizations) and the second speech (the communication of the first speech to Mr. Dinnerstein) is that the second speech arguably had a purpose, to encourage the Stevensville to cancel the Jews for Jesus reservations or else, presumably, the defendants would find another hotel to patronize to protect their religious purity. It would seem clear that the plaintiff would have no cause to complain if the defendants had simply stopped patronizing the Stevensville without explaining why. The fact that the defendants decided to collectively convey their message, however, brings this case within *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), in which the Court upheld NAACP members' boycott of white merchants to force political and business change on the ground that it was fully protected by the First Amendment. *See also Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Weiss v. Willow Tree Civic Ass'n,* 467 F.Supp. 803, 817 (S.D.N.Y.1979).

Because I conclude that defendants' speech is protected by the First Amendment, summary judgment is granted in their favor. This ruling is limited to the federal claims herein asserted, and since I decline to retain jurisdiction over plaintiff's state law claims, the action is dismissed. Submit order on notice.

---

**8.** In *Keefe,* a racially integrated community organization alleged that a real estate broker had engaged in "blockbusting" and "panic peddling" regarding the sale of local homes to Blacks. The group asked the broker to agree not to solicit property in their community. When he refused, the group distributed leaflets near the broker's home that were critical of his business practices. A state court enjoined that activity, finding that it was coercive and intimidating and therefore not entitled to First Amendment protection. The Supreme Court reversed.

**9.** *Superior Court* involved a claim by the FTC that a boycott by Washington, D.C. attorneys who regularly acted as court-appointed defense counsel violated the antitrust laws. The object of the boycott was to influence the District of Columbia to increase the compensation of court-appointed lawyers. In rejecting the attorneys' argument that their conduct was protected by the First Amendment, the Supreme Court held that a boycott conducted in order to economically advantage its participants is not protected by the First Amendment because it violates antitrust provisions. However, plaintiff does not argue that defendants' speech or conduct implicated any such issues, and therefore I do not believe that *Federal Trade Commission v. Superior Court Trial Lawyers' Association* applies to these facts.