**JEWS FOR JESUS, INC., David A. Lipkowitz, Plaintiffs–Appellants,**

**v.**

**JEWISH COMMUNITY RELATIONS COUNCIL OF NEW YORK, INC., Michael Miller, Robert Kaplan, Philip D. Abramowitz, Defendants–Appellees.**

No. 1302, Docket 91–9268.

United States Court of Appeals, Second Circuit.

Argued April 6, 1992.

Decided July 9, 1992.

**288**

Jay Alan Sekulow, Atlanta, Ga. (James M. Henderson, Atlanta, Ga., Elliot C. Rothenberg, Minneapolis, Minn., Eric A. Daley, Hauppauge, N.Y., of counsel), for plaintiffs-appellants.

Theodore B. Van Itallie, Jr., New York City (Harman Avery Grossman, Jamie Larowitz, Paul Skip Laisure, Patterson, Belknap, Webb, & Tyler, of counsel), for defendants-appellees.

Before: FEINBERG, WINTER, and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

The dispute in the underlying action centers upon the breach of a contract for public accommodations between plaintiff-appellant Jews for Jesus, Inc. ("JFJ"), a California not-for-profit religious corporation, and the Stevensville Country Club ("Stevensville"), a resort facility in Swan Lake, New York.

Upon learning of this contract, defendants-appellees Jewish Community Relations Council of New York, Inc. ("JCRC"), a New York corporation and umbrella organization comprised of approximately sixty Jewish groups, Michael Miller, executive director of JCRC, and Philip D. Abramowitz and Robert Kaplan, respectively a director and officer of JCRC's Task Force on Missionaries and Cults, together with nonparty Agudath Israel of America ("AI"), an Orthodox Jewish group that had booked space at the Stevensville shortly after JFJ, undertook a course of conduct designed to make the Stevensville breach its contract with JFJ. Among other things, defendants-appellees and AI threatened the Stevensville with an economic boycott by the Jewish community unless the Stevensville cancelled JFJ's contract. As a result of their efforts, the Stevensville cancelled the contract.

JFJ and plaintiff-appellant David A. Lipkowitz, a California resident and member of JFJ, thereafter commenced the underlying action in the United States District Court for the Southern District of New York, (Richard Owen, *Judge*), raising claims under various federal and state anti-discrimination statutes and a common law claim for tortious interference with contract. Defendants filed a motion for summary judgment arguing, among other things, that their conduct was expression protected by the First Amendment and that, in any event, plaintiffs had failed to state a claim upon which relief could be granted. Plaintiffs filed a cross-motion for summary judgment. Without discussing the merits of the underlying claims, the district court ruled that defendants' actions constituted speech protected by the First Amendment. The court therefore granted

defendants' motion and denied plaintiffs' cross-motion for summary judgment. *Jews For Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 768 F.Supp. 467, 470 (S.D.N.Y.1991).

On appeal, JFJ and Lipkowitz challenge the district court's judgment, contending that defendants' "speech," primarily in the form of an economic boycott, is not entitled to protection under the First Amendment because it was used solely to compel the Stevensville to cancel its contract with JFJ.

For the reasons set forth below, we reverse the judgment of the district court and remand the case for trial consistent with this opinion.

## BACKGROUND

Drawing all inferences in favor of plaintiffs-appellants, as we must on this appeal from a grant of summary judgment, the relevant facts are as follows. As described by the district court, JFJ "is an evangelical missionary society whose followers, Jews and non-Jews alike, believe that Jesus was the Messiah, a belief that conflicts with traditional Jewish doctrine." *Jews For Jesus*, 768 F.Supp. at 468. Following efforts by the Stevensville to solicit business from it, JFJ entered into a contract with the Stevensville in April 1987 for accommodations and meals for JFJ's "Ingathering," an annual meeting of JFJ members and their families for discussion and worship. JFJ expected approximately 350 people to attend the Ingathering, scheduled for November 19–22, 1987. Although the Stevensville is a kosher facility, it serves a Jewish and non-Jewish clientele.

Defendants learned of the contract between JFJ and the Stevensville in May 1987. At that time, defendant Kaplan contacted Kenneth Dinnerstein, president of the Stevensville, and demanded on behalf of JCRC that he cancel JFJ's reservations because JFJ was a "bad group." JCRC subsequently learned that AI, which was not a member organization of JCRC, had contracted with the Stevensville for accommodations for AI's annual convention, to be held from November 26–29, 1987. AI was unaware of JFJ's scheduled Ingathering.

JCRC thereafter contacted AI, informed it of JFJ's plans, and asked if AI would still hold its convention at the Stevensville. AI indicated that it would not. According to the deposition testimony of Rabbi Morris Sherer, president of AI, AI perceived JFJ "as a missionary group that harms basic religious interests of our people." He further indicated that JFJ used "deceptive tactics" in attempting to influence Jewish youth.

At AI's request, JCRC contacted four other Jewish groups and asked whether they would consider using a kosher catering or hotel facility that JFJ used or planned to use. All four organizations responded negatively.

JCRC and AI next contacted Mehl caterers, a kosher catering facility that subleases the Stevensville and books it over the Passover holiday. AI had hired Mehl to cater AI's planned convention at the Stevensville. AI told Mehl that if the Stevensville honored its contract with JFJ, AI would have to cancel its convention. Mehl subsequently contacted the Stevensville to voice its concern over JFJ's reservations. AI also called the Stevensville and threatened to breach its contract unless the JFJ contract was cancelled.

Finally, on July 28, 1987, the JCRC, through its executive director Michael Miller, contacted the Stevensville's President, Dinnerstein. According to Dinnerstein's affidavit, Miller told him that "the only thing that made economic sense for [the Stevensville] was to cancel Jews for Jesus' reservations" and that if the Stevensville did not break the JFJ contract, "there would be a total boycott of the Stevensville [ ] by the Jewish community," "there would be a one hundred and eighty degree turnaround in Jewish support for the Stevensville" which "would result in a very stiff penalty," and the *Jewish Press* would be contacted.

As a result of these threatened economic sanctions, which Dinnerstein believed might bankrupt the Stevensville if implemented, Dinnerstein cancelled the JFJ con-

tract and returned JFJ's deposit. *Jews for Jesus*, 768 F.Supp. at 469.

JFJ and Lipkowitz subsequently commenced the underlying action in the United States District Court for the Southern District of New York, claiming that defendants violated their civil rights under federal and state law and unjustifiably interfered with JFJ's contract with the Stevensville. Specifically, plaintiffs alleged in their amended complaint that defendants: conspired to deprive them of their civil rights in violation of 42 U.S.C. § 1985(3) (1988) (Count One); neglected to prevent conspiratorial wrongs, in violation of 42 U.S.C. § 1986 (1988) (Count Two); tortiously and intentionally interfered with JFJ's contract (Count Three); and deprived them of their civil right to obtain public accommodations without discrimination on account of race and/or creed, in violation of New York Civ.Rights Law §§ 40 & 41 (McKinney 1976) (Count Four) and New York Executive (Human Rights) Law § 296 (McKinney 1982 & Supp.1992) (Count Five).

After a period of discovery, defendants moved for summary judgment, claiming that their conduct was speech protected by the First Amendment and, in any event, plaintiffs' claims failed as a matter of law. Plaintiffs cross-moved for summary judgment. Without discussing the merits of plaintiffs' claims, the district court agreed with defendants that their actions, whether viewed as speech or conduct, were protected under the First Amendment. *Jews for Jesus*, 768 F.Supp. at 470. The district court recognized that the purpose of defendants' "speech" was to make the Stevensville break its contract with JFJ, ostensibly to safeguard the integrity of the Jewish faith against JFJ. However, the district court, relying principally on *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), reasoned that "plaintiff[s] would have no cause to complain if the defendants simply stopped patronizing the Stevensville without explaining why[, and] [t]he fact that the defendants decided to collectively convey their message" *i.e.*, that there would be a Jewish boycott unless JFJ's contract were broken, did not remove their actions from the ambit of First Amendment protection. *Jews for Jesus*, 768 F.Supp. at 470.

Accordingly, the district court granted defendants' motion for summary judgment, denied plaintiffs' cross-motion, dismissed the federal claims, and declined to retain jurisdiction over the state claims. In an amended judgment, the court also dismissed plaintiffs' state law claims. This appeal followed.

## DISCUSSION

We review the district court's grant of summary judgment *de novo*. *E.g.*, *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). Viewing the evidence in the light most favorable to the non-moving party, we can affirm the judgment of the district court only if we determine that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

Cognizant of the prudential mandate against unnecessary adjudication of constitutional issues, *see, e.g., Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, *J.*, concurring); *Browning–Ferris Indus. of South Jersey, Inc. v. Muszynski*, 899 F.2d 151, 158 (2d Cir.1990), we first examine plaintiffs' statutory and common law claims. Only if one or more of plaintiffs' claims can survive a motion for summary judgment will it be necessary to consider defendants' affirmative defense under the First Amendment.

### I. *Plaintiffs' Claims.*

#### A. Section 1985(3).

Title 42 U.S.C. § 1985(3) prohibits, in pertinent part, conspiracies undertaken "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws." As we have previously held, "an action will lie under § 1985(3) when a plaintiff is injured by a private conspiracy to

interfere with his [or her] constitutional rights, so long as there is 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Colombrito v. Kelly,* 764 F.2d 122, 130 (2d Cir.1985) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1797–98, 29 L.Ed.2d 338 (1971)). The Supreme Court added the "class-based animus" requirement in order to prevent § 1985(3) from being broadly—and erroneously—interpreted as providing a federal remedy for "all tortious, conspiratorial interferences with the rights of others." *Griffin,* 403 U.S. at 101, 91 S.Ct. at 1797–98; *see also Silkwood v. Kerr–McGee Corp.,* 637 F.2d 743, 748 (10th Cir.1980), *cert. denied,* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981).

■ Several courts, including this one, have defined "class-based animus" to include discrimination based on religion. *See, e.g., Colombrito,* 764 F.2d at 130–31; *Taylor v. Gilmartin,* 686 F.2d 1346, 1357–58 (10th Cir.1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983); *Ward v. Connor,* 657 F.2d 45, 48 (4th Cir. 1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982). Count One of plaintiffs' complaint alleges that defendants successfully conspired to deprive them of their civil and constitutional rights, *e.g.,* their right to interstate travel, *see New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1360 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990), by coercing the Stevensville to cancel JFJ's contract for public accommodations. According to plaintiff JFJ, defendants discriminated against it based on, among other things, its religious creed of evangelical Christianity. Defendants argue that JFJ is not a religion and that, in any event, their actions were not based on JFJ's espousal of evangelical Christianity, but on its allegedly deceptive use of Jewish symbols and practices, *e.g.,* wearing yarmulkes—which are unrelated and antithetical to JFJ's professed doctrine—to mislead Jews into joining an organization whose beliefs are at odds with the fundamental precepts of Judaism.

On the basis of the present record, we cannot discern whether JFJ qualifies as bona fide religious organization or whether the alleged discrimination was based on religious creed or on practices unrelated to such creed. In short, because questions of material fact pervade our consideration of these issues, the issues must be resolved at trial. *See Taylor,* 686 F.2d at 1358 ("Whether the defendants were in fact motivated by the alleged animus against religious minorities is, of course, a question for the jury.")

■ Plaintiffs also contend that they suffered racial discrimination, which certainly fulfills the "class-based animus" requirement of § 1985(3), *see Spencer v. Casavilla,* 903 F.2d 171, 174 (2d Cir.1990), because "gentiles who share the religious belief of plaintiffs are not targeted by defendants." Defendants argue, however, that plaintiff JFJ cannot be considered a "race" for purposes of the federal civil rights laws.

In the related context of claims brought pursuant to 42 U.S.C. §§ 1981 and 1982, the Supreme Court has defined racial discrimination as discrimination based solely on a person's "ancestry or ethnic characteristics." *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987); *see also Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 617, 107 S.Ct. 2019, 2021–22, 95 L.Ed.2d 594 (1987). Whether a group constitutes a race under these statutes is to be determined not solely by modern standards, but by Congress' understanding at the time it passed the pertinent statutes of what groups constituted races. *See Shaare Tefila,* 481 U.S. at 617, 107 S.Ct. at 2021–22. Under this test, Jews have been considered a race for purposes of § 1982. *Id.* at 617–18, 107 S.Ct. at 2021–22. Because § 1985(3), like §§ 1981 and 1982, was enacted in the late 19th century, *Griffin,* 403 U.S. at 99–102, 91 S.Ct. at 1796–97, we believe that similar notions of what groups constitute a race should apply under this statute.

However, determining that Jews may sue for racial discrimination under

§ 1985(3), *see, e.g., LeBlanc–Sternberg v. Fletcher,* 781 F.Supp. 261, 267–69 (S.D.N.Y.1991), does not end our inquiry. Rather, we must determine whether plaintiff JFJ can allege racial discrimination under § 1985(3). We do not believe that it can. Despite its name, the record indicates that JFJ's members include both Jews and non-Jews. Because JFJ is a racially diverse society, it cannot, by definition, constitute a racial class or, consequently, maintain a claim as "Jews" of racial discrimination. *Cf. Albert v. Carovano,* 851 F.2d 561, 572 (2d Cir.1988) (in banc) (complaint alleging racial discrimination under § 1981 against blacks and Latins dismissed because, among other things, it failed to claim that "all the appellants are black or Latin"); *see also Mahoney v. National Org. For Women,* 681 F.Supp. 129, 134–35 (D.Conn.1987).

### B. Section 1986.

■ Count Two of plaintiffs' complaint alleges that defendants "neglected to prevent" the § 1985(3) conspiracy and therefore violated 42 U.S.C. § 1986. Liability under § 1986 is derivative of § 1985 liability, *i.e.,* there can be no violation of § 1986 without a violation of § 1985. *See, e.g., McCalden v. California Library Ass'n,* 955 F.2d 1214, 1223 (9th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992); *Grimes v. Smith,* 776 F.2d 1359, 1363 n. 4 (7th Cir.1985); *Mahoney,* 681 F.Supp. at 135. Accordingly, because outstanding factual issues preclude granting summary judgment on plaintiffs' claim under § 1985(3), we also are unable to direct the entry of summary judgment on plaintiffs' § 1986 claim.

We note further that defendants assert in their answer, and in a one-sentence footnote in their appellate brief, that the § 1986 claims against defendants JCRC, Miller, and Kaplan in plaintiffs' first amended complaint are barred by the statute's one-year limitations period. *See* 42 U.S.C. § 1986; *see also* Fed.R.Civ.P. 15(c). Because the factual and legal issues surrounding the statute of limitations issue were not adequately briefed and were not argued on appeal, we believe that the district court should address this issue in the first instance on remand.

### C. Tortious Interference With Contract.

■ Count Three of the complaint alleges that defendants intentionally and without justification interfered with JFJ's contract for public accommodations with the Stevensville. Defendants counter that their actions were justified to protect the Jewish religion against the perceived threat posed by JFJ and JFJ's allegedly fraudulent use of Jewish symbols to attract followers.

■ To maintain a successful cause of action for tortious interference with contract under New York law, a plaintiff must allege and prove the existence of a valid contract and damages caused by the defendant's knowing and intentional interference with that contract without reasonable justification. *See, e.g., Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 189–90, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980); *Schulz v. Washington County,* 550 N.Y.S.2d 446, 449, 157 A.D.2d 948 (3d Dep't 1990). The key inquiry ordinarily, and in this case, is whether the interference was "without reasonable justification" or, put differently, was "improper." *Guard–Life,* 50 N.Y.2d at 189–90, 428 N.Y.S.2d 628, 406 N.E.2d 445.

To determine whether interference with a contract was justified, the New York Court of Appeals has adopted the approach set forth in the Restatement (Second) of Torts § 767 (1979). *Guard–Life,* 50 N.Y.2d at 189–90, 428 N.Y.S.2d 628, 406 N.E.2d 445. This approach requires a balancing of factors to determine whether the interference was justified under the circumstances of the particular case. These factors include: the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff with which the defendant interferes, the interests the defendant seeks to advance, the social interests at stake, the proximity of the defendant's conduct to the interference, and the relations between the parties. Restatement (Second) of Torts § 767; *Guard–Life,* 50 N.Y.2d at

190 & n. 2, 428 N.Y.S.2d 628, 406 N.E.2d 445.

As discussed above, on the basis of the present record, there are outstanding issues of material fact concerning, among other things, whether JFJ engaged in fraudulent and deceptive practices intended to injure defendants in the conduct of their religion and whether defendants' conduct was prompted by JFJ's use of such allegedly deceptive practices or, as plaintiffs contend, by impermissible discriminatory reasons. The resolution of these issues at trial will bear directly on the relative weight to assign to the factors listed above in determining whether defendants' interference with JFJ's contract was justified. Accordingly, summary judgment cannot be granted for defendants on JFJ's tortious interference with contract claim.

### D. Sections 40 and 41 of the New York Civil Rights Law.

■ Section 40 of the New York Civil Rights Law provides in pertinent part:

All persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any places of public accommodations.... [and] [n]o person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any such place shall directly or indirectly refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof ... on account of race, creed, color, or national origin ...

New York Civ.Rights Law § 40. Section 41 of the Civil Rights Law establishes, in relevant part, a private cause of action against "[a]ny person who or any agency, bureau, corporation or association which" violates section 40 "or who or which shall aid or incite" a violation of that section. New York Civil Rights Law § 41. This section therefore reaches not only those who discriminate "directly", but also those incite such discrimination.

In Count Four of their complaint, plaintiffs allege that, as a result of plaintiffs' race and/or religious creed, defendants aided or incited the Stevensville to cancel JFJ's contract. Defendants argue that plaintiffs cannot sustain a cause of action under the Civil Rights Law and that defendants are entitled to summary judgment on these claims.

With regard to plaintiff JFJ, defendants assert that it cannot maintain suit because JFJ is not a "person" but a corporation, and corporations cannot bring an action under §§ 40 and 41. We agree. By its terms, § 40 accords a right to be free from certain types of discrimination to "all persons within the jurisdiction of this state." The plain language of the Civil Rights Law and elementary principles of statutory construction indicate that the term "persons" does not include corporations.

It is well-settled that statutes are to be construed as a whole and that the words used in one section of a statute are presumed to have the same meaning when used in other sections. *See* 2A Norman J. Singer, *Sutherland Statutory Construction* §§ 46.05–.06 (1992). Section 40–c of the Civil Rights Law provides in relevant part that "[n]o *person* shall, because of race, creed, color or national origin, be subjected to any discrimination ... by any other *person* or by any firm, *corporation* or institution." (emphasis added). Furthermore, § 41 of the Civil Rights Law defines those potentially liable for violations of the statute to be "any person" or "any agency, bureau, corporation or association." The clear juxtaposition of the terms "person" and "corporation" in various sections of the statute plainly indicates that the legislature intended to refer to different entities when it used those terms. Moreover, to interpret "person" to mean "corporation" would contravene the well-established principle that each word of a statute is to be given meaning and not rendered superfluous. *See* 2A *Sutherland* § 46.06. Thus, as used in §§ 40 and 41, the term "person" means an individual. *See Moon v. Getty Realty Corp.*, 118 N.Y.S.2d 784, 785, 203 Misc. 273 (N.Y.App.Term 1952) (per curiam). Accordingly, we conclude that corporate plaintiff JFJ cannot

maintain an action under §§ 40 and 41 of the Civil Rights Law.

■ Plaintiff Lipkowitz, however, stands on different footing as he is clearly a "person" within the meaning of the Civil Rights Law. He is therefore entitled to maintain an action pursuant to § 41 provided he can show, among other things, that defendants aided or incited the Stevensville to deny him accommodations directly or indirectly, for statutorily impermissible reasons. As discussed above in Part I A in connection with plaintiffs' claims under the federal civil rights laws, however, questions of material fact exist that preclude the entry of summary judgment. We also believe on the basis of the present record that the district court is in a better position to evaluate in the first instance the mixed question of law and fact as to whether Lipkowitz was "within the jurisdiction of this state" within the meaning of the statute.

E. Section 296 of the New York Human Rights Law.

■ Section 296 of the Human Rights Law provides in relevant part:

It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation [or] resort ... because of the race [or] creed ... of any person, directly or indirectly, to refuse, withhold from or deny to such person any ... accommodations, advantages, facilities or privileges thereof....

New York Executive (Human Rights) Law § 296(2)(a). Section 296(6) of the statute further provides in pertinent part that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article." The statute also clearly defines the term "person" to include both "individuals" and "corporations." New York Executive (Human Rights) Law § 292(1).

Plaintiffs allege in Count Five of their complaint that defendants' conduct plainly violated § 296(6). A trier of fact could well find that defendants violated the statute by applying concerted economic pressure and explicit threats thereof to the Stevensville to coerce, compel, or incite the Stevensville to cancel JFJ's contract and deny access to plaintiffs. *Cf. Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 79 N.Y.2d 227, 232–33, 581 N.Y.S.2d 643, 590 N.E.2d 228 (1992). However, as with plaintiffs' other claims, questions of material fact concerning, *e.g.*, whether JFJ was discriminated against on the basis of religious creed or on the basis of certain alleged deceptive practices directly affecting defendants' religious interests, preclude the entry of summary judgment.

■ Defendants nevertheless contend that because their conduct was intended to protect the integrity of their religion, it was privileged and exempt from regulation pursuant to New York Executive (Human Rights) Law § 296(11) (McKinney 1992 Supp.). We disagree.

Section 296(11) provides in relevant part: Nothing contained in this section [296] shall be construed to bar any religious or denominational institution or organization ... from limiting employment or sales or rental of housing accommodations or admission to or giving preference to persons of the same religion or denomination or from taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained.

By its terms, § 296(11) entitles a religious organization to discriminate on the basis of religion in making decisions in its capacity as an employer and as a landlord. *See Cowen v. Lily Dale Assembly*, 354 N.Y.S.2d 269, 271–72, 44 A.D.2d 772 (4th Dep't 1974) (religious organization could discriminate on the basis of religion in renting housing accommodations that were located on organization property and were under its control). The statute further authorizes "action as is calculated by such organization to promote the religious principles for which it is established or maintained." Defendants contend that the economic pressure exerted on the Stevensville to cancel JFJ's contract was entirely justi-

fied under this language as necessary to promote and protect the principles of Judaism. We reject such an expansive interpretation of the § 296(11) exemption.

While the section authorizes religious organizations to discriminate on the basis of religion in making certain managerial or proprietary decisions, it does not authorize forcing a neutral third party to do so in that party's daily operations. Any other interpretation would be tantamount to according an unfettered license to trample on the rights of others in the name of religion. We do not believe that the legislature intended such a result. Accordingly, plaintiffs' claim under § 296 can proceed to trial on the merits.

## II. *The First Amendment Defense.*

██ Having determined that defendants are not entitled to summary judgment on most of plaintiffs' claims, we next consider defendants' contention, accepted by the district court, that defendants' actions constitute expression protected under the First Amendment. Relying principally on *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), defendants argue that the state and federal anti-discrimination statutes are unconstitutional as applied to them because they impermissibly regulate defendants' "speech" in applying economic pressure on the Stevensville and threatening to boycott the Stevensville unless it cancelled JFJ's contract. We find defendants' arguments unpersuasive.

The First Amendment guarantees of freedom of speech and of association, which are secured to all persons by the Fourteenth Amendment, are among our most fundamental rights and are integral to our democratic society. *See, e.g., Burson v. Freeman,* — U.S. —, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5 (1992). Significantly, however, these rights are not absolute. *See, e.g., Konigsberg v. State Bar of California,* 366 U.S. 36, 49 & n. 10, 81 S.Ct. 997, 1006 & n. 10, 6 L.Ed.2d 105 (1961).

██ States can constitutionally regulate conduct even if such regulation en-

tails an incidental limitation on speech. *See, e.g., United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968). A law or regulation directed at conduct that places an incidental burden on speech will be upheld "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377, 88 S.Ct. at 1679.

We observe initially that the statutes at issue in this case that bar "direct" discrimination on the basis of, among other things, race or religion, *see* 42 U.S.C. § 1985(3); New York Civ. Rights Law § 40; New York Executive (Human Rights) Law § 296(2)(a), easily satisfy these criteria. These statutes are plainly aimed at conduct, *i.e.,* discrimination, not speech. *See R.A.V. v. City of St. Paul,* 60 U.S.L.W. 4667, 4671, — U.S. —, —, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (U.S. June 23, 1992) (No. 90–7675); *Barnes v. Glen Theatre, Inc.,* — U.S. —, 111 S.Ct. 2456, 2463, 2465–67, 115 L.Ed.2d 504 (1991) (Scalia, *J.,* concurring). New York has the constitutional authority to prohibit, and a substantial, indeed compelling, interest in prohibiting, racial and religious discrimination in obtaining public accommodations. The federal government has a similar interest in preventing the discriminatory interference with constitutional rights, such as the right to interstate travel. The governmental interest in prohibiting such discrimination in these situations is not directed at or related to suppressing expression.

██ It is nevertheless true that these statutory prohibitions against discrimination can be violated by speech or other expressive conduct. However, simply because speech or other expressive conduct can in some circumstances be the vehicle for violating a statute directed at regulating conduct does not render that statute unconstitutional. *See, e.g., R.A.V. v. City of St. Paul,* — U.S. at —, 112 S.Ct. at

2546 (observing that "words[ ] may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices"); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 690–91, 93 L.Ed. 834 (1949) ("[I]t has never been deemed an abridgment of freedom of speech ... to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."); *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir.) ("[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself. E.g. ... (conspiracy).") (citation omitted), *cert. denied,* — U.S. ——, 111 S.Ct. 87, 112 L.Ed.2d 59 (1990).

In light of the foregoing, we believe that the statutes at issue in this case making "direct" discrimination unlawful pass muster under the third *O'Brien* criterion. We further believe that the statutes are no broader than necessary to further the legitimate goal of eradicating discrimination. For similar reasons, we conclude that in this case, the First Amendment is no bar to liability under the general common law prohibition of tortious interference with contract, which, like the statutes, is directed against conduct, not speech. *See Hughes v. Superior Court of California*, 339 U.S. 460, 466–68, 70 S.Ct. 718, 721–23, 94 L.Ed. 985 (1950); *McCalden*, 955 F.2d at 1220.

▮ Having concluded that the statutes outlawing direct discriminatory conduct are constitutional does not, however, end our inquiry. Plaintiffs seek to hold defendants liable under § 41 of the Civil Rights Law and § 296(6) of the Human Rights Law, which provide, respectively, a cause of action against persons who "aid or incite" or "aid, abet, incite, compel, or coerce" a violation of the Civil Rights and Human Rights statutes. The issue is whether these statutes can be constitutionally applied to defendants. We believe that they can.

Arguably, under the *O'Brien* analysis set forth above, these statutes are also constitutional as regulating discriminatory conduct, not speech. Although incitement or coercion, for example, can be accomplished through speech or other expressive conduct, they need not be. However, even assuming that these statutes in part regulate speech or expressive conduct directly, they are still constitutional.

▮ It has long been established that the First Amendment provides no defense to persons who have used otherwise protected speech or expressive conduct to force or aid others to act in violation of a valid conduct-regulating statute. *See, e.g., Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388–89, 93 S.Ct. 2553, 2560–61, 37 L.Ed.2d 669 (1973) (holding that ordinance making it unlawful to "aid" sexually discriminatory employment practices could be constitutionally applied to bar newspaper advertisements for sex-designated employment); *Hughes*, 339 U.S. 460, 70 S.Ct. 718 (permitting restraint against peaceful picketing designed to force employer to engage in discriminatory hiring practices in violation of state policy); *Giboney*, 336 U.S. at 502, 69 S.Ct. at 690–91 (permitting restraint against peaceful picketing designed to compel employer not to sell ice to non-union businesses in violation of state anti-trade restraint statute); *cf. Brewer v. Hoxie Sch. Dist. No. 46*, 238 F.2d 91, 93, 102 (8th Cir.1956) (upholding injunction that prohibited, among other things, a threatened boycott with the objective of preventing school district from implementing desegregation order). This rather unremarkable constitutional principle is incorporated into § 41 of the Civil Rights Law and § 296(6) of the Human Rights Law, which, even if viewed as regulating "speech," regulate only that speech designed to secure a violation of the anti-discrimination statutes. These statutes are unquestionably constitutional. If discrimination engaged in by "primary" actors using words can be constitutionally outlawed, *see R.A.V. v. City of St. Paul,* — U.S. at ——, 112 S.Ct. at 2547, so too can discrimination engaged in by third parties who use speech or other expressive conduct to coerce a "primary" actor to violate an anti-discrimination statute. Accordingly, these anti-discrimination statutes can

be constitutionally applied to defendants in the instant case.

 Assuming for present purposes only that plaintiffs' allegations are true, defendants engaged in concerted economic pressure, principally through a threatened boycott, with the objective of coercing the Stevensville to deny plaintiffs accommodations for reasons prohibited by the anti-discrimination statutes. Both case law and commentary recognize that a boycott (as with any mode of expression) designed to secure an unlawful objective is not protected by the First Amendment. *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 425–27, 110 S.Ct. 768, 776–77, 107 L.Ed.2d 851 (1990); *see also* Michael C. Harper, *The Consumer's Emerging Right To Boycott: NAACP v. Claiborne Hardware and Its Implications for American Labor Law*, 93 Yale L.J. 409, 430 (1984) ("[A]ny effective boycott that compels action illegal under a valid state law should not be permitted."). Moreover, it is of no constitutional significance that defendants here only threatened a boycott. If the state can regulate a boycott because its objectives are incompatible with valid laws, then it certainly can regulate the threat of such conduct, particularly when, as here, the threat was sufficient to achieve the desired illicit end. *See* Kent Greenawalt, *Criminal Coercion and Freedom of Speech*, 78 Nw.U.L.Rev. 1081, 1090 (1983) ("If the threat coupled with the demand involves ... a direct denial of a civil right, it may be punished."); *see also Brewer*, 238 F.2d at 93, 102.

Defendants erroneously rely on *Claiborne Hardware* to contend that the First Amendment renders their boycott (or threatened boycott) immune from liability. In *Claiborne Hardware*, black citizens in Claiborne County, Mississippi, boycotted white merchants in that county to force the government, as well as civic and business leaders, to effectuate the "rights of equality and of freedom that lie at the heart of the Fourteenth Amendment itself." 458 U.S. at 914, 102 S.Ct. at 3426. The boycott was enforced through peaceful picketing and speeches, as well as through violence

and threats of violence. The Supreme Court of Mississippi affirmed a judgment against the boycotters that held them jointly and severally liable for all losses incurred by the targeted businesses as a result of the boycotters' tortious interference with those businesses.

The Supreme Court reversed and held that the boycotters could not be held liable for the losses caused by the non-violent elements of the boycott. According to the Court, the state could not prohibit the non-violent elements of a "politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution." *Id.* at 914–15, 102 S.Ct. at 3426–27; *see also id.* at 914, 102 S.Ct. at 3426 ("It is not disputed that a major purpose of the boycott ... was to influence governmental action."). The Court further recognized that this was so despite the coercive nature of the boycott, stating that "[s]peech does not lose its protected character ... simply because it may embarrass others or coerce them into action." *Id.* at 910, 102 S.Ct. at 3424; *see also Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577–78, 29 L.Ed.2d 1 (1971). Finally, and most significantly for present purposes, the Court noted that it was not "presented with a boycott designed to secure aims that are themselves prohibited by a valid state law." *Claiborne Hardware*, 458 U.S. at 915 n. 49, 102 S.Ct. at 3427 n. 49 (citing *Hughes*, 339 U.S. 460, 70 S.Ct. 718); *see also Claiborne Hardware*, 458 U.S. at 933, 102 S.Ct. at 3436 ("At times the difference between lawful and unlawful collective action may be identified easily by reference to its purpose. In this case, however, petitioners' ultimate objectives were unquestionably legitimate."). For these reasons, the boycotters' peaceful activity was protected and they could not be held liable for the white merchants' business losses.

*Claiborne Hardware* is therefore readily distinguishable. Unlike the boycott in that case, the threatened boycott and other concerted economic activity in the instant case, assuming plaintiffs' allegations to be true, were designed to achieve an objective pro-

hibited by valid state and federal statutes. Moreover, in contrast to the boycott in *Claiborne Hardware*, the instant conduct was not political speech designed to secure governmental action to vindicate legitimate rights, but was a series of private communications in the context of a private dispute. Accordingly, the safe harbor carved out by *Claiborne Hardware* for certain boycott activity is unavailable to defendants.

Defendants' further contention that they are immune from liability for their conduct because they were motivated by a desire to safeguard the integrity of their religion is equally unavailing. Apart from certain statutory exceptions, *see* New York Executive (Human Rights) Law § 296(11), parties are not exempt from conforming their actions to laws of general application not directed at speech but at conduct. *See Employment Div., Dept. of Human Resources v. Smith,* 494 U.S. 872, 878–79, 110 S.Ct. 1595, 1598–99, 108 L.Ed.2d 876 (1990) ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."); *Cox v. New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941).

## CONCLUSION

We have considered defendants' remaining contentions and find them to be without merit. Based on the foregoing, the judgment of the district court is reversed and the case is remanded for trial consistent with this opinion.