**13-4891-cv(L); 14-206-cv(XAP)**
**Weber v. Tada**

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 9th day of October, two thousand fourteen.

PRESENT:  BARRINGTON D. PARKER,
          GERARD E. LYNCH,
          SUSAN L. CARNEY,
                    *Circuit Judges.*

_____

JOHN J. WEBER,
          *Plaintiff-Counter-Defendant-Appellant-*
          *Cross-Appellee*,

                v.

HIROAKI TADA, FUJIFILM MEDICAL SYSTEMS USA INC.,
          *Defendants-Counter-Claimants-Appellees*,

FUJIFILM HOLDINGS AMERICA CORPORATION, FUJIFILM CORPORATION,
          *Defendants-Counter-Claimants-Appellees-*
          *Cross-Appellants.*[*]

No.   13-4891-cv(L)
      14-206-cv(XAP)

_____

**APPEARING FOR APPELLANT/**      LORAINE M. CORTESE-COSTA, Durant
**CROSS-APPELLEE:**               Nichols, Houston, Hodgson & Cortese-Costa,

_____

[*]The Clerk is respectfully directed to amend the official caption in this case to conform with the caption above.

P.C., Bridgeport, CT.

**APPEARING FOR APPELLEES/**
**CROSS-APPELLANTS:**

PATRICK W. SHEA (Marc E. Bernstein, on the brief), Paul Hastings LLP, New York, NY.

Appeals from the United States District Court for the District of Connecticut (Janet Bond Arterton, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED IN PART** and **REVERSED IN PART**.

Plaintiff-appellant John J. Weber ("Weber") appeals from a judgment entered after trial of his claims against his former employer, defendant-appellee FUJIFILM Medical Systems USA, Inc. ("FMSU"), and against defendants-appellees Hiroaki Tada ("Tada"), FUJIFILM Holdings America Corporation ("HLUS"), and FUJIFILM Corporation ("FUJIFILM"). HLUS and FUJIFILM cross-appeal the district court's denial of their Fed. R. Civ. P. Rule 50(b) motion for judgment as a matter of law. We presume the parties' familiarity with the underlying facts and procedural history of this case, which we reference only as necessary to explain our decision.

1.      Damages for Tortious Interference and Defendants' Cross-Appeal[1]

Weber first argues that the district court erred in refusing to award him damages

---

[1] We review a district court's decision whether to award damages for abuse of discretion and any factual findings for clear error. *Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 191 (2d Cir. 2011). We review the court's denial of defendants' motion for judgment as a matter of law de novo. *Izzarelli v. R.J. Reynolds Tobacco Co.*, 731 F.3d 164, 167 (2d Cir. 2013).

for lost wages in connection with his claims of tortious interference with contract and tortious interference with business expectancy. The jury returned a verdict for Weber on these claims, but awarded him $0 in economic damages. Nevertheless, because "actual loss" is an element of tortious interference under Connecticut law, Weber argues that the jury actually *did* find that he suffered economic damages, despite the absence of any such finding on the verdict sheet. Therefore, he contends, the district court was collaterally estopped from finding that defendants' tortious interference did not proximately cause lost wages.

We need not decide this question because defendants are correct that any award for tortious interference is foreclosed by our decision in *Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029 (2d Cir. 1995). In *Boulevard Associates*, we reversed a judgment against a parent corporation for tortious interference with the contract of its wholly-owned subsidiary, applying Connecticut caselaw holding that "generally there can be no tortious interference of contract by someone who is directly or indirectly a party to the contract." *Id*. at 1035 (internal quotation marks omitted). Since a parent corporation has "significant unity of interest" with its subsidiary, we held, the parent cannot be considered a third party capable of "interfering" with its own company's contracts. *Id*. at 1036 (internal quotation marks omitted). We noted two possible exceptions to this general rule: namely, where a parent corporation has an "'improper motive'" or employs "'improper means'" to induce its subsidiary to breach a contract, such behavior "may be sufficiently egregious to cross the line and become tortious." *Id*. at 1037, quoting *Blake*

3

*v. Levy*, 191 Conn. 257, 262 (1983).

Here, HLUS and FUJIFILM moved for summary judgment on the tortious interference claims prior to trial on the ground that, as FMSU's parent corporations, they could not be held liable for tortious interference with its employment contract with Weber. The district court denied summary judgment in light of Weber's allegation that he was terminated based on discriminatory animus, which the court held could be a type of improper motive recognized in *Boulevard Associates*. We need not decide whether this ruling was correct, however, because at the end of the trial, the jury rejected the discrimination claims and found that Weber had not established discriminatory animus as a motive for his termination. HLUS and FUJIFILM then renewed their argument in a Rule 50(b) motion for judgment as a matter of law.[2] The district court denied the motion, finding that tortious interference could still be maintained under the "improper means" exception, because defendants "falsely designat[ed Weber's] termination with the damaging label 'for cause' just to avoid the financial obligations to pay severance for a without-cause termination." (Special App'x 104.)

That ruling was error. We made clear in *Boulevard Associates* that any improper means must be directed at the *breaching* party, not at the victim of the breach. *See id*. at 1037 ("Tortious interference with contract requires the use of improper means to induce a

---

[2]Weber argues that defendants waived this argument by not raising it in a Rule 50(a) motion at the close of the evidence. We disagree. Given that the district court predicated its denial of summary judgment on this claim on the possibility that the jury could find discriminatory motive, defendants had no occasion or need to present the argument made here until the jury reached its verdict on the discrimination claims.

party to breach the agreement; thus, [the parent corporation's] actions had to intimidate [the subsidiary] rather than [plaintiff]."). Here, there is no contention that HLUS and FUJIFILM fraudulently induced FMSU or Tada to breach the employment contract. To the contrary, Weber's allegation all along has been that upon taking over leadership of FMSU, Tada colluded with the parent companies to terminate him.[3] Nor is the motive of avoiding financial obligations improper. *See id*. at 1038 (noting that "a desire to protect the financial interests" of the corporation is not an improper motive). Accordingly, neither exception to the general rule that parent corporations cannot interfere with the contracts of their subsidiaries applies here.

The jury found that defendants breached their contract with Weber and that he therefore was entitled to compensatory damages in the amount of one year's severance pay. Under Connecticut law and our precedent, no additional tort was committed. As this case is governed squarely by our decision in *Boulevard Associates*, we reverse the district court's denial of defendants' motion for judgment as a matter of law on the tortious interference claims, and hence do not reach Weber's argument about the measure of damages on these claims.

      2.      Admission of After-Acquired Evidence of Weber's Misconduct[4]

---

[3]Although Weber alleges his reply brief that HLUS and FUJIFILM "engaged in a plan to harass Mr. Tada," the evidence he cites demonstrates nothing more than the parent companies directing FMSU to terminate Weber for cause and does not come close to meeting the standard of egregious conduct discussed in *Boulevard Associates*.

[4]We review the district court's evidentiary rulings for abuse of discretion. *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011).

5

Weber next argues that the district court erred in admitting evidence of his alleged misconduct at FMSU, including payments to an FMSU employee, Louise Collins, after she had left the company; the provision of interest-free loans to employees; and certain irregularities with a financing agreement between FMSU, a bank, and a consultant (the "Auric/Ostrowsky financing arrangement"). Defendants initially sought to assert counterclaims against Weber based on this alleged misconduct. The district court denied supplemental jurisdiction over those counterclaims, and defendants pursued them in state court. Defendants then sought to admit this evidence as "after-acquired" evidence, meaning that they were unaware of it when they terminated Weber. The district court held that insofar as defendants were unaware of Weber's misconduct, they could not rely on evidence of that misconduct to establish a non-discriminatory motive for his termination. However, the court admitted the evidence for two limited purposes: first, to show that defendants' purported non-discriminatory reason for terminating Weber – his mismanagement of FMSU – was true, and second, as a defense to his breach of contract claim, specifically to show that Weber materially breached the contract first.

While the federal trial was ongoing, a New York court granted Weber summary judgment against defendants' counterclaims. The New York court held that defendants were aware of Weber's payments to Collins and the interest-free loans to other employees, and either explicitly approved of or acquiesced to them. With respect to the Auric/Ostrowsky financing arrangement, the state court held that the Business Judgment Rule protected Weber from liability for any irregularities. Following the New York

decision, Weber renewed his objection to the admission of this evidence in the federal district court. The court precluded any further testimony about the Collins payments, but continued to allow testimony about the Auric/Ostrowsky financing arrangement. Weber argues that this was error because it failed to give collateral estoppel effect to the New York decision.

Weber's argument overstates the holding of the New York court. In concluding that Weber's actions with respect to the Auric/Ostrowsky financing arrangement were protected by the Business Judgment Rule, the state court did not find that defendants knew of the irregularities in the arrangement and approved them. Defendants were therefore not estopped from arguing that the after-acquired evidence of Weber's role in the arrangement confirmed their suspicions that he mismanaged FMSU's finances. *See Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 147 n.17 (2d Cir. 1999). With respect to the Collins payments, the district court precluded further testimony about them after the New York court rendered its decision. Finally, Weber points to only two instances of testimony about the interest-free loans, both of which occurred *before* the New York decision. Any error in allowing these brief mentions of the interest-free loans within a four-week trial was harmless. Accordingly, we find no basis for reversal in connection with the challenged evidentiary rulings.

7

3.    Jury Instruction on the FCN Treaty[5]

Weber next argues that the district court erred in instructing the jury on the application of the Friendship, Commerce, and Navigation Treaty between the United States and Japan ("the FCN Treaty").  The FCN Treaty permits each party "to engage, within the territories of the other Party, . . . executive personnel . . . of their choice."  Treaty of Friendship, Commerce and Navigation, U.S.-Japan, art. VIII(1), Apr. 2, 1953, 4 U.S.T. 2063.  Courts have interpreted the treaty to permit Japanese companies to prefer their citizens to Americans in executive positions in their offices here.  *See Fortino v. Quasar Co., a Div. of Matsushita Elec. Corp. of Am.*, 950 F.2d 389, 391 (7th Cir. 1991); *see also Papaila v. Uniden Am. Corp.*, 51 F.3d 54, 55 (5th Cir. 1995).  But "discrimination in favor of foreign executives given a special status by virtue of [the] treaty . . . is not equivalent to discrimination on the basis of national origin," which is prohibited by Title VII.  *Fortino*, 950 F.2d at 392.

The district court instructed the jury that citizenship and national origin were distinct, and explained that the FCN Treaty protected discrimination based on citizenship, but not discrimination based on national origin.  Therefore, the court instructed, "[I]f you find that Mr. Weber has proven by a preponderance of the evidence that his national origin, as distinguished from his citizenship, was a motivating factor in defendants'

---

[5]We review challenges to jury instructions de novo, reviewing the instruction as a whole.  *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 390 (2d Cir. 2006).

decision to terminate him . . . Mr. Weber will have prevailed on his [discrimination] claims." (Special App'x 69-70.) Weber argues that the court erred, however, in not instructing the jury that (1) the burden was on defendants to prove that Japanese citizenship was a bona fide occupational qualification for his position, and (2) that U.S. subsidiaries of foreign corporations are American companies and therefore are not protected by the FCN Treaty.

We need not address this argument because the district court's instruction adequately stated the law applicable in this case. Title VII forbids discrimination based on national origin, not based on citizenship. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 89-91 (1973). Whether or not the FCN Treaty offered protection to defendants for citizenship-based discrimination was therefore irrelevant. The district court carefully explained the distinction between citizenship and national origin to the jury, curing any potential for confusion about the application of the treaty. Moreover, the instruction that Weber argues he should have gotten would not have made any difference. The court's instruction made clear that the treaty did not protect defendants against Weber's claim of national origin discrimination, which was the form of discrimination charged in the complaint and prohibited by Title VII. With or without his proposed additional instruction, Weber could prevail on his Title VII claim only if the jury found that defendants fired him based on national origin. We accordingly find no error in the district court's instruction.

4.      Summary Judgment Claims[6]

a.      Race discrimination claim

Weber argues that the district court erred in granting summary judgment to defendants on his race discrimination claim. Preliminarily, Weber is correct that he may assert a claim of racial discrimination as a Caucasian under 42 U.S.C. § 1981. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976). Nevertheless, the district court correctly granted summary judgment because Weber could point to no evidence that would establish a genuine issue of material fact as to whether defendants terminated him because of his race. *See Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986). Before this Court, Weber cites his affidavit, which states only that he is American and Caucasian and that defendants hired two individuals who were Japanese, neither of whom replaced Weber. Since no rational juror could infer from this evidence that Weber was terminated because of his race (as opposed to his national origin), the grant of summary judgment was proper. *See Mario v. P&C Food Mkts., Inc.*, 313 F.3d 758, 767 (2d Cir. 2002).[7]

---

[6]We review the district court's grant of summary judgment de novo. Mathirampuzha v. Potter, 548 F.3d 70, 74 (2d Cir. 2008).

[7]We need not address Weber's dubious contention that "American" constitutes a "race," *see St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, *J.*, concurring) ("[D]iscrimination based on *birthplace alone* is insufficient to state a claim under § 1981." (emphasis in original)); *see also Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 292 (2d Cir. 1992) ("[A] racially diverse society . . . cannot, by definition, constitute a racial class or, consequently, maintain a claim [under § 1981]."), because any race discrimination claim predicated on the fact that

10

b. Excess benefit claims

Finally, Weber argues that he is owed money from an excess benefit retirement plan that FMSU established in 1994. Defendants point to a 2006 document that states, "Pursuant to the Unanimous Written Consent of the Company's Board of Directors . . . the Plan is terminated with respect to all earned and vested amounts that were allocated to each Participant's Account . . . [and] each Grandfathered Account shall be distributed in a single cash sum as soon as practicable." (Joint App'x 270.) The record reflects that Weber was paid $449,486.24 on February 16, 2007, and that this sum represented the earned and vested amount that was in his retirement account as of December 31, 2004. (Joint App'x 224, 315.) Defendants also provide evidence that on September 5, 2007, Weber signed a form electing "that the entire vested amount in my Plan Account be distributed to me in a single sum payment (less applicable tax withholdings) in January 2008" and that he thereafter was paid $26,307.45 in connection with that election. (Joint App'x 226, 315.) Though Weber continues to insist that he is owed more money from the 1994 Plan, he fails adequately to explain the evidentiary basis for that contention in his brief. We thus have no reason to disturb the district court's award of summary judgment on that claim. *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

We have considered all of Weber's remaining arguments and find them to be

---

Weber was racially "American" would merely duplicate his national origin discrimination claim, which was rejected by the jury.

11

without merit.  For the foregoing reasons the judgment of the district court is

REVERSED as to the tortious interference claims, AFFIRMED in all other respects, and

REMANDED with instructions to enter judgment for the defendants on the tortious

interference claims.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, Clerk of Court