**X–MEN SECURITY, INC.,
et al., Plaintiffs,**

**v.**

**Governor George PATAKI,
et al., Defendants.**

**No. 96 Cv. 5041.**

United States District Court,
E.D. New York.

July 10, 1997.

Order Denying Reconsideration
Oct. 29, 1997.

Michael A. Hardy, Scheurer, Wiggin & Hardy, New York City, for plaintiffs.

Gregory J. McDonald, Office of the Attorney General of the State of New York, New York, NY, Julian Friedman, Stillman & Friedman, P.C., New York, NY, Stephen Riegel, U.S. Attorney's Office, EDNY, for defendants in Memorandum and Order.

Stephen Riegel, U.S. Attorney's Office, EDNY, Michael L. Stern, Senior Asst. Counsel, Office of the General Counsel, U.S. House of Reprentatives, Washington, D.C., for defendants in Memorandum and Order on Reconsideration.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

### SUMMARY

This civil rights case arises from the termination of a contract held by X–Men Security, Inc. ("X–Men") to provide security guard services to a housing development in Brooklyn, New York known as Ocean Towers. The

plaintiffs are X–Men, its owner Anthony Richards and Sheila Boyd, a tenant of Ocean Towers. The defendants fall into three groups: those in the private sector ("the Private Defendants"); those who, at the time of the events alleged, held official positions in the government of the State of New York, ("the State Defendants"); and a United States Congressman, Peter King ("King"). The complaint charges the defendants with violating federal civil rights laws and New York state law by terminating X–Men's contract.

All defendants now move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6); the State Defendants also move under Fed. R.Civ.P. 12(b)(1). For the reasons set forth below, the Private Defendants' motion should be granted, and the motions of the State Defendants and King should be granted in part and denied in part.[1]

## BACKGROUND

### The Plaintiffs

X–Men is a private corporation that provides security and protective services. The majority of its employees, and its owner Richards, are black and Muslim and attend mosques that follow the teachings of the Nation of Islam, one of whose ministers is. Louis Farrakhan. According to the complaint, X–Men is not affiliated with the religious corporation of the Nation of Islam.

Plaintiff Boyd is the president of the Ocean Towers Tenants Association, an advocacy group for the tenants of Ocean Towers.

### The Defendants

The Private Defendants are DU Third Realty, Co. L.P. ("DU"), the owner of Ocean Towers; Bernard Jereski, a partner of DU; BSR Management Corp. ("BSR"), the managing agent of Ocean Towers; and Aaron Silberman, an officer of BSR. They are alleged to have acted in concert with the State Defendants who are George Pataki, Governor of the State of New York; Jules Polonetsky, a New York State Assemblyman; and Jo-

seph H. Holland, the former New York State Commissioner of the Division of Housing and Community Renewal ("DHCR"), and with King, United States Representative for the Third Congressional District of New York. The State Defendants and King are sued in their individual capacities.

### Regulation of Ocean Towers

Although Ocean Towers is privately owned and operated, it receives public financing from both the federal and state governments. The development is regulated by the federal government through the Housing and Urban Development Agency ("HUD") and by the State of New York through the DHCR. As part of its oversight, DHCR regulations require that contracts over $500 at Ocean Towers be awarded through a competitive bidding process. See 9 N.Y.C.R.R. § 1728–4.1(b). Prior DHCR approval is needed to enter into contracts in excess of $5,000, and on such contracts, the presumption is that the building owner will recommend to DHCR that the contract be awarded to the lowest responsible bidder. See 9 N.Y.C.R.R. § 1728–4.1(d)(1) and (g).

## FACTS

The following facts are accepted as true for purposes of this motion.

Until June 28, 1993, Ocean Towers was plagued by violent crime, gangs and drugs. Compl. ¶¶ 20–23. On that date, N.O.I. Security, Inc. ("N.O.I.") contracted with DU, the development's owner, and BSR, the manager, to provide security services to Ocean Towers. Id. at ¶ 24. The contract was executed by Dion Muhammad, an officer of N.O.I., and Bernard Schreiber, the late president of BSR, and was to extend for one year. Id.; Pl.'s Br. in Opp. to State Defs. Motion to Dismiss, p. 14. Pursuant to an amendment to the contract, N.O.I.'s parent company, X–Men, became the "named holders" of the contract. Compl. ¶ 24.

Following execution of the contract, X–Men began performing 24 hour-a-day, 7 day-

---

**1.** The Private Defendants have moved in the alternative for summary judgment pursuant to Fed.R.Civ.P. 56. As elaborated upon below, the court has determined that the complaint fails to state a claim against the Private Defendants and therefore has not considered materials outside the pleadings.

a-week security functions at Ocean Towers. Their efforts resulted in a cleaner, safer, and more secure environment at the complex almost immediately. *Id.* at ¶¶ 28–29. Drug trafficking ceased, vandalism was reduced, and overall security was vastly improved. *Id.* at ¶ 29.

The complaint alleges that shortly after X–Men began its work at Ocean Towers, defendants Polonetsky and King, motivated by racial and religious prejudice, formed a conspiracy with three objectives: (1) terminating X–Men's contract with DU and BSR; (2) preventing X–Men and Richards from procuring future contracts; and (3) preventing Boyd and the other tenants of Ocean Towers from enjoying the benefits of X–Men's security services. *Id.* at ¶¶ 36, 39, 41. Using their official positions to create a public frenzy, the conspirators made false allegations that: X–Men was controlled by Farrakhan; the Nation of Islam profited from the Ocean Towers contract; X–Men was a racist hate group; and X–Men and Richards were guilty of fraud, mismanagement and unpaid debts. *Id.* at ¶¶ 40–44.

Notwithstanding the alleged conspiracy, X–Men worked under their one-year contract for the remainder of 1993 and into 1994. When the contract expired, they continued to provide security on a month-to-month basis. *Id.* at ¶¶ 25, 57. Despite BSR's pleasure with X–Men's performance during this time, the complaint alleges that it came under pressure from DHCR to solicit open bids for the security contract as required by DHCR regulations. In August 1994, BSR reluctantly went ahead and sought bids on the Ocean Towers security guard contract.

While BSR was considering the bids it received, Polonetsky and King forwarded a letter under Polonetsky's signature dated September 24, 1994 to then-DHCR Commissioner Donald Halperin. The letter stated, in relevant part:

Since the Nation of Islam promotes hatred against whites, Jews, women, Catholics and others, it is difficult to understand how the X–Men are eligible for a state-supported contract—which requires compliance with equal employment and nondiscrimination guidelines. It seems clear that state support for this contract subsidizes the activities of a hate group and helps fund the racist and anti–Semitic goals of Louis Farrakhan and the Nation of Islam.

*Id.* at ¶ 45. Later in the letter, Polonetsky urged the Commissioner to terminate the contract with X–Men. *Id.* at ¶ 46. According to the complaint, the efforts of Polonetsky and King were at least partially successful because on or about November 14, 1994, Jereski and Silberman (on behalf of DU and BSR) notified X–Men that their contract would not be renewed for a definite term. *Id.* at ¶ 47.

At the conclusion of the 1994 bidding process, BSR recommended that DHCR reject all the submitted bids and retain X–Men on account of the "dramatic improvements" in security that were made on their watch. *Id.* at ¶ 49, Ex. A. DHCR followed this advice and rejected the bids, enabling X–Men to continue providing security at Ocean Towers during 1994 and 1995 on a monthly basis.

Over that time, the complaint alleges that Polonetsky succeeded in bringing Pataki, Holland, DU, BSR, Jereski and Silberman into the conspiracy. Compl. ¶ 55. The conspirators' goal was allegedly achieved on September 9, 1996 when BSR notified X–Men that the contract would be terminated once and for all effective October 10, 1996. *Id.* at ¶ 62. On that date, Task Force Security Ltd., the low bidder in the 1995 bidding process, was scheduled to take over security at Ocean Towers. However, that date came and went without Task Force taking over because, allegedly, they were not competent to perform the required services. A security company that had not participated in the 1995 bidding process was eventually brought in on a monthly basis. *Id.* at ¶ 64.

X–Men, Richards and Boyd filed the complaint in this action in October 1996 charging all defendants with violating 42 U.S.C. §§ 1981, 1983 and 1985(3). The State Defendants and King are also charged with tortious interference with contract in violation of New York state law. Plaintiffs seek $200 million in compensatory and punitive damages as relief.

## DISCUSSION

### I. Standing of Plaintiff Boyd

■ As a threshold matter, it is argued by the State Defendants that plaintiff Boyd lacks standing to prosecute this action because she has not suffered any cognizable injury as a result of the unlawful acts charged.

In order for a federal court to assert jurisdiction over an action, the court must find that a justiciable "case or controversy" exists. *See* U.S. Const., Art. III, § 2. Standing is the principle doctrine to determine whether a case or controversy exists and the doctrine which delineates a plaintiff's entitlement to invoke the power of a federal court. *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir.1994). The Supreme Court has determined that a plaintiff must satisfy three criteria to have standing: (1) personal injury or threat of injury; (2) that the injury fairly can be traced to the action; and (3) that the injury is likely to be redressed by the requested relief. *Garelick v. Sullivan*, 987 F.2d 913, 918–19 (2d Cir.), *cert. denied*, 510 U.S. 821, 114 S.Ct. 78, 126 L.Ed.2d 47 (1993). The alleged injury cannot be "abstract" in character. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983). It must be "distinct and palpable." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (internal quotations omitted). In other words, a plaintiff must demonstrate that she "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 102, 103 S.Ct. at 1665 (internal quotations omitted).

The complaint in this case fails to allege any facts from which it can be inferred that Boyd (or any other tenant of Ocean Towers) has been or will be injured as a result of defendants' conduct. The complaint does not allege that as a result of the contract termination Boyd has been, or is likely to be, a crime victim, nor does it allege that Ocean Towers lacks adequate security or has suffered an increase in crime. It is not alleged that Boyd or the tenants of Ocean Towers are in danger of having present or future security contracts terminated by BSR, DU or DHCR. Any suggestion that these events are likely to happen in the future is purely speculative. Boyd's mere interest in, or concern over, the termination of X–Men's contract "—no matter how deeply felt—is insufficient to demonstrate injury in fact." *Evans v. Lynn*, 537 F.2d 571, 591 (2d Cir.1975) (en banc), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). Accordingly, this court has no jurisdiction over Boyd's constitutional claims and they should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

### II. Legal Standard on a Motion to Dismiss

■ In analyzing a motion to dismiss for failure to state a claim, the court must view the complaint in the light most favorable to plaintiff and accept all allegations contained therein as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Dismissal of a complaint under Fed. R.Civ.P. 12(b)(6) is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Yusuf v. Vassar College*, 35 F.3d 709, 713 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). Complaints based on civil rights statutes must include specific allegations of facts showing a violation of rights "instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987).

### III. § 1981

Plaintiffs' first cause of action claims that all defendants violated 42 U.S.C. § 1981 by terminating X–Men's contract out of racial animus.

Section 1981 bars certain racially motivated and purposefully discriminatory acts. It provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give

evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (West 1983).

To state a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e. the right to make and enforce contracts). *Mian v. Donaldson, Lufkin, & Jenrette Secs.,* 7 F.3d 1085, 1087 (2d Cir.1993). In order to survive a motion to dismiss, plaintiffs must allege with specificity "the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf,* 35 F.3d at 713. Under *Yusuf,* it is not enough to simply assert that the defendant took adverse action against the plaintiff and the action was the product of racial animus. The complaint must allege specific facts supporting both the existence of the racial animus and the inference of a link between the adverse treatment and the racial animus. Indication of racial bias may be found in the form of statements attributable to the decision-makers responsible for the adverse action, or patterns of conduct that suggest the influence of race in decision-making. *Id.* at 715. Mere conclusory allegations are insufficient. *See Mian,* 7 F.3d at 1088.

■ Defendants argue first that plaintiffs cannot maintain a claim as "blacks" of racial discrimination because they have not alleged that all the employees of X–Men are black. They cite two Second Circuit cases in support of this assertion, *Jews For Jesus, Inc. v. Jewish Community Relations Council, of New York, Inc.,* 968 F.2d 286 (2d Cir.1992), and *Albert v. Carovano,* 851 F.2d 561, 572 (2d Cir.1988). In *Jews for Jesus* ("JFJ"), the Second Circuit held that the religious organization of the same name could not maintain a claim for racial discrimination where the record indicated that the organization was comprised of both Jew and non–Jews.[2] "Because JFJ is a racially diverse society, it cannot . . . maintain a claim as 'Jews' of racial discrimination." 968 F.2d at 292. *Carovano* involved a claim that Hamilton College selectively enforced its disciplinary rules against the plaintiffs because they were "black or Latin." The Circuit Court observed in that case that no allegation had been made in the complaint that *all* the plaintiffs were black or Latin and this omission undercut plaintiffs' argument that the discrimination complained of was based on race. 851 F.2d at 572.

On the complaint alone, the court cannot conclude that X–Men are barred from bringing a claim as "blacks" of racial discrimination. The complaint alleges that "a majority of [X–Men] employees are of Black African–American descent." Compl. ¶ 32. This language leaves open the possibility that all the employees of X–Men are black but not of African–American descent or that an overwhelming percentage are black. In any event, plaintiff Richards is black and can maintain a claim. The court should therefore turn to examine the sufficiency of plaintiffs' allegations.

### A. *Private Defendants*

■ The complaint alleges only the following in regard to the Private Defendants: Jereski and Silberman informed X–Men in November 1994 that the contract would not be renewed for a definite period (¶ 47); all bids submitted during the 1994 bidding process were rejected by BSR (¶ 48); DU and BSR were eventually brought into the conspiracy (¶ 55); and X–Men was informed by BSR that their month-to-month contract would be terminated effective October 10, 1996 (¶ 62).

These facts do not give rise to an inference that the Private Defendants were motivated by racial animus either to terminate X–Men's

---

**2.** Jews have been considered a race for purposes of federal civil rights laws. *See Jews for Jesus,* 968 F.2d at 291.

month-to-month contract or in failing to award them the new contract after competitive bidding. No allegations are made that evidence a pattern of discriminatory conduct by the Private Defendants and no statements reflecting an intent to discriminate are attributed to Jereski or Silberman. Carefully read, the complaint actually rebuts the suggestion that the Private Defendants possessed discriminatory intent. It expressly states that the Private Defendants "set back" the efforts of the conspirators by rejecting (or recommending rejection of) all the 1994 bids in an effort to retain X–Men at Ocean Towers. Compl. ¶ 51. It further alleges that the Private Defendants had to be "pressured" to terminate the contract because they were supportive of their tenants' wishes to keep X–Men on the job. *Id.* at ¶¶ 50, 56. Appended to the complaint is a letter from BSR to DHCR which endorses retention of X–Men based on their exceptional performance in improving security. Compl., Ex. A. These allegations fly in the face of plaintiffs' claim that the Private Defendants discriminated against X–Men on the basis of race.

### B. *State Defendants and King*

The complaint is similarly deficient with respect to the § 1981 claim against the State Defendants and King. As to Pataki and Holland, the complaint alleges only that: Pataki made a statement connecting X–Men to Louis Farrakhan (¶ 59); Holland became a member of the conspiracy (¶ 61); and both men failed to use their offices to investigate whether the non-discrimination clauses of X–Men's contract were violated. No statements or pattern of conduct reflecting discrimination toward blacks are alleged.

■ In regard to Polonetsky and King, the complaint alleges that: they wrote a letter urging termination of the contract because of X–Men's purported affiliation with the Nation of Islam (¶¶ 42–46); they participated in the decision to exclude X–Men from the 1994 bidding process (¶ 48); and they caused HUD to investigate X–Men (¶¶ 51–56). These allegations raise no plausible inference that Polonetsky or King harbored or acted upon any racial bias. While it could be inferred that Polonetsky and King were motivated to act as they did based on X–Men's religious affiliation with the Nation of Islam, § 1981 does not cover claims based on religious discrimination. *See LeBlanc–Sternberg v. Fletcher,* 781 F.Supp. 261, 267 (S.D.N.Y.1991); *Catholic War Veterans of the United States, Inc. v. City of New York,* 576 F.Supp. 71, 74 (S.D.N.Y.1983).

■ As regards plaintiffs' § 1981 claim in general, it is noteworthy that the complaint identifies a crucial race-neutral factor that significantly contributed to X–Men's fate, i.e., its failure to submit the lowest bid in the 1995 bidding process. This alternative reason for its failure to win the new contract, combined with the lack of any factual support for a claim of racial motivation "illustrates that [the] claim here is simply a 'naked allegation' of racial discrimination." *Yusuf,* 35 F.3d at 714. Accordingly, plaintiffs' § 1981 claim should be dismissed as against all defendants.

### IV. *§ 1983*

The second cause of action charges that the defendants violated 42 U.S.C. § 1983 by causing a deprivation of plaintiffs' rights under the First, Fifth and Fourteenth Amendments to the constitution.

> Section 1983 provides in pertinent part:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...

42 U.S.C. § 1983 (West 1983). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994) (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985)). In order to state a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law; and

(2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the constitution or laws of the United States. *See e.g., Rendell–Baker v. Kohn,* 457 U.S. 830, 835, 102 S.Ct. 2764, 2768, 73 L.Ed.2d 418 (1982).

### A. *Under Color of State Law*

While there is no dispute that the actions of the State Defendants and King were taken under color of state law, the Private Defendants argue that their actions were not and are therefore beyond § 1983's reach.

"In order for the actions of private parties to constitute state action, 'the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State.'" *Clapp v. LeBoeuf, Lamb, Leiby & MacRae,* 862 F.Supp. 1050, 1059 (S.D.N.Y. 1994), *aff'd,* 54 F.3d 765 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 380, 133 L.Ed.2d 303 (1995) (quoting *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982)). The Supreme Court established a two-pronged inquiry to determine when conduct is "fairly attributable" to the State in *Lugar:*

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

457 U.S. at 937, 102 S.Ct. at 2753–54.

■ That the Private Defendants complied with DHCR bidding regulations does not transform their actions into those of the State. *See Lugar,* 457 U.S. at 939, 102 S.Ct. at 2754–55 (private party acting pursuant to state statute does not become state actor solely by virtue of their resort to the statute). Nor are the mere facts that Ocean Towers is subject to extensive regulation, *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350,

95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974), and is publicly subsidized, *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 544, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 (1987), enough, by themselves, to turn their owners into state actors. Moreover, "[a]cts of ... private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell–Baker v. Kohn,* 457 U.S. at 841, 102 S.Ct. at 2771.

■ The Private Defendants are not state actors under a conspiracy theory either. In order to state a § 1983 claim against private individuals on a conspiracy theory, the complaint must allege facts demonstrating that the private persons entered into an agreement with state officials to deprive the plaintiff of constitutionally protected interests. *See Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.), *cert. denied,* 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992); *Julian v. New York City Transit Auth.,* 857 F.Supp. 242, 252 (E.D.N.Y.1994), *aff'd,* 52 F.3d 312 (2d Cir.1995) (requiring "'specific facts suggesting that there was mutual understanding among the conspirators to take actions directed toward an unconstitutional end'" in order to establish a conspiracy under § 1983) (quoting *Duvall v. Sharp,* 905 F.2d 1188, 1189 (8th Cir.1990)). *See also Fonda v. Gray,* 707 F.2d 435, 439 (9th Cir. 1983) (§ 1983 claim against private defendants fails without "evidence of the existence of a 'meeting of the minds' between [private and governmental defendants] to knowingly attempt to accomplish an alleged wrongful purpose."). "[C]omplaints containing only 'conclusory,' 'vague,' or general allegations of a conspiracy to deprive a person of constitutional rights will be dismissed." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977).

■ The complaint does not allege a "meeting of the minds" between the Private Defendants and the State Defendants or King. To the contrary, as noted above, the complaint states that the Private Defendants "set back" and "resisted" their efforts, and had to be "pressured" to terminate X–Men's contract. Compl. ¶¶ 50, 51, 56. These allegations belie the assertion that the Private

Defendants wilfully collaborated with any state actors and requires dismissal of the § 1983 claims against them.

### B. *Personal Involvement*

"In this Circuit, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). A plaintiff must allege that each defendant "directly and personally [was] responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

#### 1. Private Defendants

■ The § 1983 claims against the Private Defendants should be dismissed for the additional reason that the complaint fails to adequately allege their personal involvement in the alleged constitutional deprivations. In the 97-paragraph complaint, only the four specific allegations set forth in Part IIIA above are made about the Private Defendants' role in the allegedly unlawful conduct. Silberman and Jereski are mentioned only once, in a conclusory statement that they were brought into the conspiracy; there is no indication of how these defendants were personally involved in the alleged constitutional violations or how they injured the plaintiffs by complying with the applicable regulations on bidding. For this additional reason, the § 1983 claims against the Private Defendants cannot stand.

#### 2. State Defendants and King

■ In *Williams v. Smith,* 781 F.2d 319 (2d Cir.1986), the Second Circuit outlined four ways in which a supervisory official like Gov. Pataki or Commissioner Holland may be personally involved in a § 1983 violation: (1) he may have directly participated in the infraction; (2) he may have failed to remedy a wrong after learning of a violation; (3) he may have created or allowed a policy to continue under which the violation occurred; or (4) he may have been grossly negligent in managing the subordinates who caused the violation. *Id.* at 323–24.

The allegations concerning the personal involvement of Pataki and Holland, set out in Part IIIB above, are insufficient to raise an inference that either was involved in the deprivations of X–Men's constitutional rights in any of the ways described in *Williams v. Smith.* The § 1983 claims against them should be dismissed.

The allegations in respect of the personal involvement of Polonetsky and King stand on a different ground, as will be discussed below.

### C. *Constitutional Violations*
#### 1. First Amendment

In paragraph 80 of the complaint, plaintiffs claim their First Amendment rights "to the free exercise of their religion, and their rights of speech and assembly have been abridged by defendants' conduct."

■ In order to state a claim for violation of First Amendment rights, a plaintiff must allege (1) conduct that is constitutionally protected, and (2) that the conduct was a motivating or substantial factor in causing action taken by the defendant on which the claim is based. *See Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). As the complaint is devoid of any specific allegations that the defendants interfered with the exercise of plaintiffs' religion or freedom of speech, the court construes the First Amendment claim to assert that X–Men were terminated in retaliation for their association with the Nation of Islam and Farrakhan. *See* Pl. Mem. in Opp. to Private Defs' Motion to Dismiss, p. 28.

■ The right of association encompasses the right to associate for the purpose of engaging in those activities protected by the First Amendment, including the exercise of religion. *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984). In this regard, the complaint alleges that Polonetsky and King conspired to bring about termination of the contract based on X–Men's affiliation, which is religious in nature, with the Nation of Islam and Farrakhan. Compl. ¶ 45. It further states that Polonetsky circulated false

statements connecting X–Men to Farrakhan and the Nation of Islam in furtherance of his unlawful purpose, and that he and King acted to exclude X–Men from the competitive bidding process. These acts allegedly exerted pressure on the Private Defendants and led to termination of the contract and thus are sufficient to raise an inference that X–Men were retaliated against based on their association with the Nation of Islam and Farrakhan.

■ The defendants do not dispute that plaintiffs have properly set forth a claim for retaliation in violation of their right of association. Instead, they argue that plaintiffs cannot "prove" X–Men's religious affiliation was the motivating factor in the decision to terminate the contract as is required under *Mount Healthy*. However, at the pleading stage, plaintiffs need not come forward with proof; they need only set forth a short and plain statement showing they are entitled to relief, which they have done. *See* Fed. R.Civ.P. 8(a)(2). Accordingly, they have stated a claim against Polonetsky and King for violation of their First Amendment rights.

### 2. Equal Protection

Plaintiffs next allege that the contract was terminated on account of their race and religion in violation of their right to equal protection under the law. Compl. ¶¶ 81, 83. Specifically, they claim that defendants selectively treated X–Men on the basis of their race and religion, and in doing so "blackballed" and "black listed" them.

The equal protection clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3253–54, 87 L.Ed.2d 313 (1985)). An equal protection claim based on "selective enforcement" is proper where it is established that "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or

religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Zahra,* 48 F.3d at 683–84. A plaintiff must satisfy both prongs to state a claim. *Id.* at 684.

Drawing all reasonable inferences in favor of the nonmovant, the court finds that plaintiffs have pled the outlines of an equal protection violation. They have satisfied the first prong by alleging they were selectively treated. According to the complaint, Polonetsky and King used their public positions to single out X–Men to be targets of a campaign of prejudicial statements and false accusations and pressed the Private Defendants to bring X–Men's presence at Ocean Towers to a close. Compl. ¶¶ 42–45, 56. It is also alleged that they unfairly excluded X–Men from the 1994 bidding process. *Id.* at ¶ 48. While plaintiffs fail to specifically allege that other security services were not subject to similar actions, these allegations *"necessarily* imply that other similarly situated enterprises were not subject to the same harassment." *Pisello v. Town of Brookhaven,* 933 F.Supp. 202, 211 (E.D.N.Y.1996) (emphasis in original).

Plaintiffs easily meet the second prong of the test by alleging the selective treatment was based on their religious affiliation. Compl. ¶ 41. Accordingly, they have stated a claim against Polonetsky and King for violation of their right to equal protection.

### 3. Procedural Due Process

Plaintiffs also charge that defendants' conduct caused them to suffer a deprivation of property without due process of law. In order to sustain such a claim, a plaintiff must "first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process." *Mehta v. Surles,* 905 F.2d 595, 598 (2d Cir.1990) (per curiam).

#### a. Identification of a Property Right

It is unclear from the complaint whether plaintiffs are claiming that the property right of which they were deprived was the continuation of X–Men's month-to-month contract or an entitlement to be awarded a new contract

through the bidding process. However, under either theory, they have not alleged a property interest.

■ Property interests protected by due process are neither created nor defined by the Constitution. Rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In order to have a protectible property interest in a benefit, one "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* The Second Circuit has explained that

> [w]hen determining whether a plaintiff has a claim of entitlement, we focus on the applicable statute, contract or regulation that purports to establish the benefit. We note that although a public contract can confer a protectible benefit, not every contract does so, and the type of interest a person has in the enforcement of an ordinary commercial contract often is qualitatively different from the interests the Supreme Court has thus far viewed as 'property' entitled to procedural due process protection.

*Martz v. Incorporated Village of Valley Stream,* 22 F.3d 26, 30 (2d Cir.1994) (citations omitted).

In *S & D Maintenance v. Goldin,* 844 F.2d 962 (2d Cir.1988), the Second Circuit examined whether an entity that contracts with the government to provide services has a contractual right giving rise to a legitimate claim of entitlement and thus a constitutionally protected property interest. S & D alleged a denial of procedural due process in connection with New York City's refusal to pay for services it rendered to maintain parking meters. (The City had withheld payments pending a criminal investigation into the circumstances under which S & D obtained one of the meter maintenance contracts.) The Court observed that, ordinarily,

the types of cases afforded procedural due process protection are those which involve a state's revocation of a status, i.e. those characterized by a quality of either extreme dependence (welfare recipient), or permanence (tenure in public employment) and stated that it was hesitant "to extend the doctrine further to constitutionalize contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a government contractor." 844 F.2d at 966–67. It went on to hold that "[i]n the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause.*" *Id.* (emphasis in original). The court concluded that S & D had no property interest in non-termination because the contract at issue gave the City the right to terminate at any time.

■ *S & D* applies with full force here. The contract X–Men assumed from N.O.I. was for a term of one year during which it could only be terminated "for cause." *See* Ex. 1 to State Defs' Mem. Upon expiration of the contract, (and with it the "for cause" provision), they were retained on a monthly basis with no definite duration. Compl. ¶ 57, Pl. Mem. in Opp. to State Defs' Motion to Dismiss, p. 14. Under New York law, a contract for services that makes no specific provision for duration is presumed to be terminable at will. *See White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1062 (2d Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993). As noted in *S & D,* where an employer has the right to terminate a contract for any reason, there is no constitutionally protected property interest. *See also White Plains Towing,* 991 F.2d at 1062 (towing company had no protectible property interest in continuation of highway towing assignment because there was no limit on state's right to terminate); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249–250 (2d Cir.1985) (holding that "involvement in publicly financed projects does not rise to the level of a property interest"; and observing "[c]ertainly Eastway desired—and perhaps even needed or expected—to continue acting as a

general contractor on public redevelopment projects. But it fails to point to a single constitutional, statutory or contractual provision that would entitle it to do so. And absent any such right, its claim that the City's actions violate § 1983 is incorrect as a matter of law.") Therefore, it follows that X–Men had no property interest in continuation of its month-to-month contract.

■ Nor did X–Men have a constitutionally protected interest in being awarded the new security contract through the competitive bidding process. It is well-established that "[n]either the low bidder nor any other bidder has a vested property interest in a public works contract." *Conduit and Foundation Corp. v. Metropolitan Transportation Auth.*, 66 N.Y.2d 144, 148, 495 N.Y.S.2d 340, 485 N.E.2d 1005 (1985); *see also Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1352 (2d Cir.1994) ("[B]idders lack property rights in future contracts to be awarded under competitive bidding procedures."). Moreover, it is conceded by plaintiffs that DHCR and the Private Defendants retained discretion in awarding the contract. *See* Compl. ¶ 48. When official action is discretionary, "one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection." *Walentas v. Lipper*, 862 F.2d 414, 419 (2d Cir.1988), *cert. denied*, 490 U.S. 1021, 109 S.Ct. 1747, 104 L.Ed.2d 183 (1989) (quoting *RR Village Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1202 (2d Cir.1987)); *see also Transcontrol Corp. v. Metropolitan Tran. Auth.*, No. 82 Cv. 7504(VLB), 1987 WL 12090, at *10 (S.D.N.Y. June 2, 1987) (holding that rules and regulations requiring Transportation Authority to award contract to lowest responsible bidder contemplated exercise of discretion and thus did not confer protected property interest on low bidder). This retention of discretion establishes that X–Men had no entitlement to or property interest in the contract to be awarded.

Because plaintiffs have failed to allege that they were deprived of a constitutionally protected property interest, "no process is 'due.'" *Russell Pipe and Foundry Co., Inc. v. City of New York*, No. 94 Civ. 8642(JFK), 1997 WL 80601, at *7 (S.D.N.Y. Feb.25, 1997).

### b. Sufficiency of Process

■ Even if the court were to assume that a protectible property interest existed, plaintiffs' procedural due process claim would still fail because they have available to them all the process that is due. (This is so in spite of the fact that plaintiffs provide no authority for their argument that DHCR regulations gave them the right to a hearing on termination of the contract). Where a plaintiff establishes that he was deprived of a post-deprivation hearing, the existence of an adequate and meaningful state post-deprivation remedy may be sufficient to satisfy the procedural component of the due process clause. *See Hudson v. Palmer*, 468 U.S. 517, 530–33, 104 S.Ct. 3194, 3203–04, 82 L.Ed.2d 393 (1984). The availability of an Article 78 proceeding in state court in which plaintiffs could challenge the award of the contract provides a meaningful post-deprivation remedy. *See Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (Article 78 was adequate post-deprivation remedy for City contractor), *petition for cert. filed*, 65 USLW 3755, (May 1, 1997) (No. 96–1746); *Eastway*, 762 F.2d at 250 ("The Article 78 proceeding in New York's state courts constituted due process sufficient to protect Eastway's claimed property interest in a fair and impartial review of its application."). In addition, they can file a breach of contract suit in state court. *See Katz v. Klehammer*, 902 F.2d 204, 206 (2d Cir.1990).

### 4. Substantive Due Process

■ Plaintiffs' § 1983 claim can also be read to assert a substantive due process violation. Substantive due process protects those interests that are "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). It is well settled that, where "the alleged right ... cannot be considered 'so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" notions of substantive due process will not apply. *Reno v. Flores*, 507 U.S. 292, 303, 113 S.Ct. 1439, 1447–48, 123 L.Ed.2d 1 (1993).

In *Local 342, Long Island Public Service Employees v. Town Bd.*, 31 F.3d 1191 (2d Cir.1994), the Second Circuit refused to extend substantive due process protection to state law contract rights such as those at issue here. *Local 342* involved a dispute over a collective bargaining agreement governed by a New York law which proscribed unilateral alteration of the terms of the agreement. Local 342 argued that the Town Board's unilateral termination of an insurance trust as the health benefits provider for its employees deprived its members of a legitimate claim of entitlement to payments by the Town to the trust and therefore violated its substantive due process rights. In affirming the district court's dismissal of the complaint, the Second Circuit held:

> We do not think ... that simple state-law contractual rights, without more, are worthy of substantive due process protection. Such rights are not the type of "important interests that have heretofore been accorded the protection of substantive due process." ... We agree with the Sixth Circuit's statement that "[r]outine state created contractual rights are not 'deeply rooted in this Nation's history and tradition,' and, although important, are not so vital that 'neither liberty nor justice would exist if [they] were sacrificed.'" *Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir. 1990) (internal citations omitted).

31 F.3d at 1196 (parallel citations omitted).

For these reasons it is clear that plaintiffs cannot set forth a substantive due process claim bottomed on termination of X–Men's contract.

## V. *§ 1985(3)*

■ The complaint's third cause of action claims that defendants violated 42 U.S.C. § 1985(3) by conspiring to deprive plaintiffs of their constitutional rights.

Section 1985(3) provides:

If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, ... the party so injured ... may have an action for the recovery of damages, occasioned by such injury ... against any one or more of the conspirators.

42 U.S.C. § 1985(3) (West 1983).

A plaintiff states a claim for relief under § 1985(3) by alleging four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States. *Mian*, 7 F.3d at 1087. "Furthermore, the plaintiff must allege that the conspiracy was motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* (quoting *United Broth. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 829, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983)). A conspiracy claim under § 1985 must be pled with some degree of specificity; plaintiffs must offer more than "vague, general or conclusory accusations," *Mass v. McClenahan*, 893 F.Supp. 225, 231 (S.D.N.Y.1995), and overt acts of the defendants must be alleged with particularity. *Powell v. Workmen's Compensation Bd.*, 327 F.2d 131, 137 (2d Cir.1964).

### A. *Private Defendants*

The § 1985(3) conspiracy claim against the Private Defendants should be dismissed because, as set forth in Parts IIIA and IVA above, they neither entered into the alleged conspiracy nor acted with discriminatory motivation.

### B. *State Defendants and King*

As also noted above, plaintiffs have not alleged with any degree of particularity overt acts by defendants Holland or Pataki which were related to promotion of the claimed

conspiracy. The § 1985(3) claims against them should therefore be dismissed.

The actions of Polonetsky and King are not alleged with a great deal of specificity but they are sufficient to withstand a motion to dismiss the § 1985(3) claim. Among other things, Polonetsky and King are alleged to have begun an effort to unseat X–Men as the security contract holders shortly after June 28, 1993 (¶ 38); to have made false accusations concerning X–Men in furtherance of the conspiracy (¶¶ 42–44); to have forwarded the September 24, 1994 letter to DHCR urging termination of X–Men's contract based on their affiliation with Farrakhan (¶ 45); to have excluded X–Men from the 1994 bidding process (¶ 48); and to have been motivated to take these actions because of X–Men's religious affiliation with the Nation of Islam (¶¶ 41–42). Given the clandestine nature of a conspiracy, the court finds that these allegations set out, in as much detail as is currently available, a § 1985(3) claim against Polonetsky and King.

### VI. *Tortious Interference with Contract*

Plaintiffs' fourth cause of action is a common law claim against the State Defendants for tortious interference with contract. They charge that the State Defendants "intentionally" brought about breach of their contract to provide security "by causing its cancellation as of October 10, 1996." Compl. ¶ 94.

Under New York law, the elements of a claim for tortious interference with contract are: "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996). Further "[i]n order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party." *Robins v. Max Mara, U.S.A., Inc.,* 923 F.Supp. 460, 468 (S.D.N.Y.1996) (quoting *Jack L. Inselman & Co. v. FNB Fin. Co.,* 41 N.Y.2d 1078,

1080, 396 N.Y.S.2d 347, 364 N.E.2d 1119 (1977)).

As discussed above, X–Men completed its one year contract and thereafter provided security services on an at-will basis. Since this gave the Private Defendants the right to terminate the contract for any reason, their discharge of X–Men in October 1996 was not a breach of contract. In the absence of a breach, plaintiffs' tortious interference claim should be dismissed.[3]

### VII. *Qualified Immunity of Polonetsky and King*

Polonetsky and King assert that to the extent plaintiffs have stated valid claims against them, they are protected by qualified immunity. Qualified immunity is a defense which, if proven, shields government agents from liability for civil damages insofar as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Even if the rights in question are clearly established, a government actor may still be shielded by qualified immunity if "it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky,* 929 F.2d at 925. The purpose of the defense is to avoid "subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery," which include the "distraction of officials from their government duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow,* 457 U.S. at 816–818, 102 S.Ct. at 2737.

Generally speaking, "[q]uestions of immunity should be resolved at the earliest possible stage of the litigation so that an officer who is immune from suit will not have to proceed through a lengthy trial to establish that fact." *Dempsey v. Town of Brighton,* 749 F.Supp. 1215, 1226–27 (W.D.N.Y.1990), *aff'd,* 940 F.2d 648 (2d Cir.), *cert. denied,* 502

---

**3.** Because plaintiffs have failed to state a claim for tortious interference with contract, the court

need not reach the United States' motion to substitute itself for King in this cause of action.

U.S. 925, 112 S.Ct. 338, 116 L.Ed.2d 278 (1991). However, in *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir.1990), *cert. denied*, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990), the Second Circuit stated that the better practice is for a court to decide the issue of qualified immunity as a matter of law "preferably on a pretrial motion for summary judgment."

Polonetsky and King have moved to dismiss the complaint for failure to state a claim and it appears that little discovery has taken place in this case. Their assertion of the qualified immunity defense is therefore premature. The better time for determining the issue is on a motion for summary judgment. *See Interboro Institute, Inc. v. Maurer*, 956 F.Supp. 188 (N.D.N.Y.1997). Accordingly, their motion to dismiss on this ground should be denied.

## VIII. *Legislative Immunity of King*

Defendant King argues that the claims against him should be dismissed because they are predicated on legislative activity subject to the absolute protection of the constitution's Speech or Debate Clause.

■ The Speech or Debate Clause provides that "for any Speech or Debate in either House [members of Congress] shall not be questioned in any other Place." U.S. Const., Art. I, § 6, cl. 1. In *Kilbourn v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1880), the first case in which the Supreme Court interpreted the clause, it was held that Congressmen were absolutely immune from liability for "things generally done in a session of the House by one of its members in relation to the business before it." *Id.* at 204. Later, in *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951), a case in which a former witness attempted to sue a state legislative committee, the Court limited the rule of *Kilbourn* and held that the clause immunizes a legislator who acts "in the sphere of legitimate legislative activity." What acts fall within that sphere was elaborated upon in *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), a case arising from publication of the Pentagon Papers, in which the Court held that a legislator is protected if his or her

action was "an integral part of the deliberative and communicative processes ... with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Id.* at 625, 92 S.Ct. at 2627.

In *United States v. Brewster*, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), a case that involved the prosecution of a United States Senator, the Court held that the clause "does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Id.* at 528, 92 S.Ct. at 2545. Thus, voting and debating on the House floor, preparing committee reports, conducting committee hearings and compiling and subpoenaing records are protected; running errands for constituents, arranging appointments with government agencies, helping individuals seeking government contracts, preparing news letters, news releases and delivering speeches outside of the House are not. *Id.* at 512, 92 S.Ct. at 2537.

■ It bears repeating that the complaint makes the following allegations about King: (1) he and Polonetsky began the conspiracy to terminate the X–Men; (2) he used his official position to create a public frenzy about the X–Men; (3) he caused accusations to be made that X–Men were a racist hate group; (4) he and Polonetsky wrote the September 24, 1994 letter to DHCR urging termination of the contract; (5) he participated in the decision to exclude X–Men from the 1994 bidding process; and (6) he was successful in getting HUD and a House subcommittee to investigate the X–Men. King himself acknowledges that it is "unclear" to what extent these allegations "involve ... protected legislative activities." King Mem. of Law, p. 11.

In this court's view, it can only be said with confidence that the sixth allegation constitutes protected legislative activity. To the extent King sought to pressure others to terminate the contract and made extra-legislative statements about the X–Men, his conduct is not protected. *See Gravel*, 408 U.S.

at 625, 92 S.Ct. at 2627 ("Members of Congress ... may cajole, and exhort with respect to administration of a federal statute—but such conduct, though generally done, is not protected legislative activity"). In addition, the letter he sent to DHCR along with Polonetsky would probably not be protected. *See·Hutchinson v. Proxmire,* 443 U.S. 111, 133, 99 S.Ct. 2675, 2687, 61 L.Ed.2d 411 (1979) (Speech or Debate Clause does not immunize Senator·from liability for statements made in news letters and press releases). While it is unclear when some of King's statements were made, the chronology of the complaint suggests that they were not made in connection with Congressional committee hearings or investigations. If so, they are not protected.

The court is mindful that the Speech or Debate Clause prohibits not only inquiry into acts that are manifestly legislative, but also into acts that are purportedly legislative to determine if they are legislative in fact. *See United States v. Biaggi,* 853 F.2d 89, 103 (2d Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989). However, contrary to King's contention, the fact that the allegations against him might implicate his legislative activity does not require dismissal of the complaint. In *United States v. Murphy,* 642 F.2d 699, 700 (2d Cir.1980), congressmen who were indicted for taking bribes in the Abscam sting operation appealed the district court's denial of their motion to dismiss the indictment on the grounds that it violated the Speech or Debate Clause. The Second Circuit upheld the ruling and in doing so, stated with regard to vague allegations in the indictment,

> [O]vert act number 20 alleges that [defendants] met in Washington with another Congressman. That overt act, as alleged in the indictment, is not on its face protected by the Speech or Debate Clause, but if an offer of proof at trial indicates that it is protected when assessed in light of the other evidence, the [defendants] will be entitled to have that particular allegation stricken.

King will be afforded the same protection.

This court cannot conclude on the basis of the complaint that King is fully shielded by the Speech or Debate Clause. Accordingly, his motion to dismiss on this ground should be denied.

### CONCLUSION

For the reasons set forth above, the following claims should be dismissed: (1) plaintiff Boyd's claims; (2) plaintiffs' § 1981 claims; (3) plaintiffs' § 1983 claims as asserted against the Private Defendants, Pataki and Holland; (4) those § 1983 claims asserting due process violations by defendants Polonetsky and King; (5) plaintiffs' § 1985(3) claims against the Private Defendants, Pataki and Holland; and (6) the tortious interference with contract claim.

The following claims remain viable: (1) § 1983 claims against Polonetsky and King for violations of the First Amendment and Equal Protection guarantees of the Constitution; and (2) the § 1985(3) claim against Polonetsky and King.

SO ORDERED.

### MEMORANDUM AND ORDER ON RECONSIDERATION

#### SUMMARY

The allegations that make up the basis for the underlying litigation are set forth in detail in the Memorandum and Order issued by this Court on July 10, 1997 ("July 10th Order"). Familiarity with that document is assumed.

The facts, briefly, are as follows: X–Men is a private corporation that provides security and protective services. Ocean Towers is a privately owned and operated apartment complex that receives public financing from both the federal and state governments. The development is regulated by the federal government through the Housing and Urban Development Agency ("HUD") and by the ·State of New York through the Division of Housing and Community Renewal ("DHCR"). The complaint alleges that shortly after X–Men began providing security at Ocean Towers, defendants Jules Polonetsky (a New York State Assemblyman) and Peter King (United States Representative for the Third Congressional District of

New York), motivated by racial and religious prejudice, formed a conspiracy with three objectives: (1) terminating X–Men's contract with the owners and managing agent of Ocean Towers; (2) preventing X–Men and its owner from procuring future contracts; and (3) preventing the tenants of Ocean Towers from enjoying the benefits of X–Men's security services. Compl. at ¶¶ 36, 39, 41. Using their official positions to create a public frenzy, the conspirators made false allegations that: X–Men was controlled by Farrakhan; the Nation of Islam profited from the Ocean Towers contract; X–Men was a racist hate group; and X–Men and Richards were guilty of fraud, mismanagement, and unpaid debts. *Id.* at ¶¶ 40–44.

Plaintiffs also allege that Polonetsky and King forwarded a letter under Polonetsky's signature dated September 24, 1994 to then–DHCR Commissioner Donald Halperin. The letter stated, in relevant part:

> Since the Nation of Islam promotes hatred against whites, Jews, women, Catholics and others, it is difficult to understand how the X–Men are eligible for a state-supported contract—which requires compliance with equal employment and nondiscrimination guidelines. It seems clear that state support for this contract subsidizes the activities of a hate group and helps fund the racist and anti-Semitic goals of Louis Farrakhan and the Nation of Islam.

*Id.* at ¶ 45. Later in the letter, Polonetsky urged the Commissioner to terminate the contract with X–Men. *Id.* at ¶ 46. Plaintiffs claim that this conspiracy and letter led to the termination of X–Men's contract with Ocean Towers.

As a result of these occurrences, plaintiffs brought the present action against Polonetsky, King, and others alleging various civil rights violations as well as tortious interference with a contract. In its Memorandum and Order dated July 10, 1997, this Court dismissed the tortious interference claims and all of plaintiffs' claims that were based on 42 U.S.C. § 1981. It also dismissed all of plaintiffs' § 1983 and § 1985 claims except for those brought against defendants Jules Polonetsky and Peter King.

In this motion, Defendant King requests that this Court reconsider the portions of its Memorandum and Order that deny King's motion to dismiss the claims against him under §§ 1983 and 1985. He argues that

> in permitting plaintiffs to proceed in this case against two legislator defendants while dismissing similar claims against the Private Defendants and the State Executive Defendants, the Court's memorandum (1) is inherently inconsistent and contradictory in its treatment of claims against the defendants; (2) adopts a wholly novel and expansive theory of liability for constitutional torts, potentially having a chilling effect on the ability of legislators (and others) to speak out on matters of public importance; and (3) fails to address the merits of defendant King's qualified immunity defense (which would include consideration of the prior two points) before discovery, as the Supreme Court has directed.

Def's Mem. of Law 1. Although it is not entirely clear, it appears that defendant's motion for reconsideration is predicated on point (3)—the contention that this Court overlooked controlling authority in declining to rule on the merits of King's claim of qualified immunity. *See also id.* at 6 ("The remaining civil rights claims against defendant King should be dismissed on the basis of his qualified immunity from suit.").

### DISCUSSION

*Standard for Motion to Reconsider*

As a general principle, a motion to reconsider will be granted only if the movant "present[s] 'matters or controlling decisions the court overlooked that might materially have influenced its earlier decision.'" *Anglo American Ins. Group, P.L.C. v. CalFed*, 940 F.Supp. 554, 556 (S.D.N.Y. 1996) (quoting *Morser v. AT & T Information Systems*, 715 F.Supp. 516, 517 (S.D.N.Y. 1989)). "Rule 3(j) [now Rule 6.3] is to be narrowly construed and strictly applied to avoid repetitive arguments on issues that have been considered fully by the court." *Id.* (citing *Ades v. Deloitte & Touche*, 843 F.Supp. 888, 892 (S.D.N.Y.1994)). Thus, to persuade the court to reconsider its decision, it is not enough for a party to make a more

convincing argument than was made the first time. "The law of the case will be disregarded only when the court has 'a clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981), *cert. denied,* 459 U.S. 828,. 103 S.Ct. 65, 74 L.Ed.2d 66 (1982) (citations omitted).

### Application to the Present Motion

 As noted in this court's July 10th Order, qualified immunity is a defense that, if proven, shields government agents from liability for civil damages insofar as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Even if the rights in question are not clearly established, a government actor may still be shielded by qualified immunity if "it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky,* 929 F.2d at 925. The purpose of the defense is to avoid "subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery," which includes the "distraction of officials from their government duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow,* 457 U.S. at 816–18, 102 S.Ct. at 2737. Generally speaking, "[q]uestions of immunity should be resolved at the earliest possible stage of the litigation so that an officer who is immune from suit will not have to proceed through a lengthy trial to establish that fact." *Dempsey v. Town of Brighton,.* 749, F.Supp. 1215, 1226–27 (W.D.N.Y.1990), *aff'd,* 940 F.2d 648 (2d Cir.), *cert. denied,* 502 U.S. 925, 112 S.Ct. 338, 116 L.Ed.2d 278 (1990).

Nevertheless, defendant King's assertion that no discovery may be had until the question of qualified immunity is resolved is not correct. As support for this contention, King quotes *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)): " '[u]ntil this threshold immunity question is resolved, discovery should not be allowed.' " Def.'s Mem. of Law 6. A careful reading of *Harlow* and *Siegert,* however, reveals that the "threshold question" referred to is whether the plaintiff has stated a violation of a clearly established constitutional right—it is not whether qualified immunity is or is not available to the defendant. *See Harlow* at 818, 102 S.Ct. at 2738.

It has already been determined that the plaintiffs have sufficiently pleaded several violations of their constitutional rights. *See* July 10th Order. It is true, however, that this court did not directly address whether under preexisting law defendant King would have understood that his acts were unlawful. To that end, it is noted that defendant has moved for dismissal on the pleadings and, therefore, all of plaintiffs' allegations are taken as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Plaintiffs have alleged that defendant, among other things, made false accusations that X–Men is a "hate group" and "racist" and that it engaged in "fraud, mismanagement, unpaid debts, and other irregularities," Compl. ¶ 44, and that, even after a Congressional investigation cleared X–Men of any wrongdoing, defendant continued to assert these and other false allegations in order to "create a public frenzy which would lead to the termination of the contract upon illegal discriminatory grounds". *Id.* at ¶ 40. Given these allegations, this court cannot hold, at this stage of the proceedings, that as a matter of law it was objectively reasonable for King to believe that his conduct was lawful. *See Kaminsky v. Rosenblum,* 929 F.2d 922, 926 (2d Cir.1991).

 Furthermore, even were it determined that defendant King's actions were objectively reasonable, such a finding would not resolve the question of qualified immunity. As noted in the July 10th Order, plaintiffs have alleged that defendant King's actions were animated by an unconstitutional motivation. "The defendants do not dispute that plaintiffs' have properly set forth a claim for retaliation in violation of their right of

association. Instead, they argue that plaintiff's cannot 'prove' X–Men's religious affiliation was the motivating factor in the decision to terminate the contract as is required under *Mount Healthy.*" July 10th Order at 112. Plaintiff's equal protection claim as well as their § 1985 claim are also predicated on defendant's unconstitutional motivation. *Id.* at 112–13.

To the extent that this court's July 10th Order was ambiguous with respect to its reliance on the recent second circuit case, *Sheppard v. Beerman,* it is here clarified. Where an unconstitutional motivation is alleged, even if a defendant's conduct was objectively reasonable, he may, nevertheless, be denied the defense of qualified immunity. *See Sheppard v. Beerman,* 94 F.3d 823, 828 (2d. Cir.1996). As the Second Circuit has stated,

> where the subjective state of mind of the actor is part of the constitutional mix, we have developed a rule that balances the interests of the official claiming immunity against the interests of the employee asserting unconstitutional motive:
>
>> Upon a motion for summary judgment asserting a qualified immunity defense in an action in which an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must proffer particularized evidence of direct or circumstantial facts ... supporting the claim of an improper motive in order to avoid summary judgment.

*Id.* (quoting *Blue v. Koren,* 72 F.3d 1075, 1084 (2d Cir.1995)). *See also Martin v. D.C. Metropolitan Police Dept.,* 812 F.2d 1425, 1437 (D.C.Cir.1987) (A defendant's "qualified immunity claim[ ] can be defeated by direct evidence of [his] subjective intent—evidence which ... is now in the defendant['s] sole possession. We may ... permit sharply limited discovery in [that] context.")

It is, therefore, not possible for the court to resolve this issue on defendant's 12(b)(6) motion, as the court "would obviously have to consider matters outside the pleadings." *Id.* at 828. Plaintiffs have not yet had the opportunity to conduct discovery and cannot "proffer particularized evidence of direct or

circumstantial facts ... supporting the claim of an improper motive." *Id.* Thus, "[t]he qualified immunity defense cannot be established on the pleadings alone where an unconstitutional motive is alleged." *Hayes v. Sweeney,* 961 F.Supp. 467, 476 (W.D.N.Y. 1997) (citing *Sheppard v. Beerman,* 94 F.3d 823, 828 (2d Cir.1996); *Blue v. Koren,* 72 F.3d 1075, 1084 (2d. Cir.1995)). *See also Martin v. D.C. Metropolitan Police Dept.,* 812 F.2d 1425, 1437 (D.C.Cir.1987) ("We have noted that credible pleas of official immunity remove cases from the mine-run category.... Nonetheless we are alert to this reality: Allowing plaintiffs to raise certain claims of unconstitutional motive could become an empty gesture were we to impose a blanket restriction on *all* discovery prior to the resolution of the qualified immunity issue on summary judgment.")

### *CONCLUSION*

For the foregoing reasons, defendant King's motion for reconsideration is denied. In order to minimize the burdens imposed upon the government officials who remain as defendants in this case, the scope of plaintiffs' discovery is limited to the issue of defendant King's and defendant Polonetsky's subjective intent.

SO ORDERED.